354 F.3d 1058
 Rafael D.O. BEIER, Dr., Plaintiff-Appellee,
v.
LEWISTON, CITY OF; Jack Baldwin; John Doe; Jane Doe, in their official capacities as officials, employees and/or agents of the City of Lewiston, State of Idaho; Nez Perce County, a political subdivision of the State of Idaho; Jane Doe, in their official capacities as jailers, officials, employees and/or agents of Nez Perce County, Idaho; Randy S. Kingsbury, in his capacity as Sheriff of Nez Perce County, Idaho, Defendants, and
Brad Mittendorf, in his capacity as a police officer of the city of Lewiston, Idaho; Joedy Mundell, in his capacity as a police officer of the City of Lewiston, Idaho, Defendants-Appellants.
 No. 02-35516.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted September 8, 2003.
 Filed January 14, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Bentley G. Stromberg, Clements, Brown & McNichols, Lewiston, ID, for the defendants-appellants.
 Timothy K. Ford, MacDonald, Hoague & Bayless, and Richard K. Kuck, Seattle, WA, for the plaintiff-appellee.
 Appeal from the United States District Court for the District of Idaho; Edward J. Lodge, District Judge, Presiding. D.C. No. CV-99-00244-EJL.
 Before THOMPSON, HAWKINS, and BERZON, Circuit Judges.
 OPINION
 BERZON, Circuit Judge.
 
 
 1
 Officer Joedy Mundell and Corporal Brad Mittendorf (collectively "the officers") arrested Rafael Beier for violating a temporary protection order the terms of which they had neither read nor ascertained from authorized personnel. Beier brought suit under 42 U.S.C. § 1983, asserting that the arrest was in violation of the Fourth Amendment. The officers appeal from the district court's denial of their motion, on qualified immunity grounds, for summary judgment. We affirm.
 
 I. BACKGROUND
 
 2
 In June 1997, Beier and his wife, Susan Beier ("Susan"), were in the process of divorcing. Susan called the police after a dispute arose between Beier and their son, Joseph. Mundell, a member of the Lewiston Police Department, responded to the call. After Mundell interviewed Susan and Beier, Beier left the premises. Mundell then described to Susan the process for obtaining a civil protection order and gave her a pamphlet concerning such orders.
 
 
 3
 Shortly afterwards, Susan applied for and obtained a temporary protection order against Beier. The order provided, as here pertinent:[1]
 
 
 4
 1. The Respondent [Beier] shall not commit, threaten to commit, or attempt to commit (either in person or through any other person) any act of physical injury, sexual abuse, or forced imprisonment upon the Petitioner [Susan Beier] and Minor Children [Dresden and Joseph Beier]
 
 
 5
 . . . .
 
 
 6
 b. Respondent ... shall not harass or follow the other [Petitioner Susan Beier] and shall not contact or attempt to contact the other in person[,] in writing[,] by a third person[, or] by telephone.
 
 
 7
 c. Respondent shall not, EVEN IF INVITED BY THE PETITIONER, go within: 300 feet ... of Petitioner's residence ... and Petitioner's work place....[2]
 
 
 8
 . . .
 
 
 9
 5. Temporary custody of the minor children ... Dresden (16) [and] Joseph (15) is awarded: to the Petitioner.
 
 
 10
 6. Parent without temporary custody[,] Respondent[,] shall NOT have visitation until further ordered by the Court.
 
 
 11
 A few days after obtaining the protection order, Susan attended church services. Beier appeared at the church with Benjamin, his infant son from another relationship. Beier had been a member of the congregation before he was excommunicated for reasons not pertinent here. He was nonetheless permitted — indeed encouraged — by the church to continue attending services there. Beier sat with Benjamin several rows behind Susan. Joseph and Dresden subsequently came to the church as well and informed Susan that Beier was present with Benjamin. Although Joseph and Dresden approached Beier and attempted to persuade him to leave, he refused.
 
 
 12
 Disturbed by Beier's presence, Susan consulted with Bishop Douglas Piper and, on his advice, called the Lewiston Police Department, asking specifically for Mundell. When Mundell returned her call, Susan told him that she had obtained a restraining order against Beier, and that Beier was violating the order.[3] Mundell called the police dispatcher to confirm the issuance and service of the protection order but did not request information about the order's terms. Mundell then came to the church. When he arrived, Susan advised him that she had a copy of the order in her purse, which was in the church chapel.
 
 
 13
 On the way to retrieving Susan's purse from the chapel, Mundell encountered Beier, who was standing in the foyer with Joseph and Dresden. Mundell repeatedly asked Beier to leave, but he refused. At some point, the parties moved outside, and Mundell informed Beier that he was in violation of the protection order. According to Beier, Joseph, and Dresden, Beier informed Mundell that he was not in violation of any restraining order and asked Mundell to read the order for himself. According to Joseph, Mundell responded that he had not read the order and did not know the details of the order, but that Beier would be arrested if he did not leave the church.
 
 
 14
 Mittendorf later arrived at the scene to assist Mundell. After the dispute continued for some time and Beier persisted in refusing to leave, Mittendorf placed Beier under arrest for violating a civil protection order. Dresden attempted to intervene on his father's behalf, and a scuffle ensued involving Mittendorf, Beier, Mundell, and Dresden.
 
 
 15
 The record contains conflicting evidence with regard to the tone of the discussion. The officers claim that they attempted to reason with Beier while he was being verbally abusive and hostile. Beier claims that he stayed calm throughout the discussion, but that Mundell addressed him in a degrading manner. While some aspects of this emotionally charged interaction are, as noted, disputed, the critical point is not: Neither Mundell nor Mittendorf had read the protection order, or had its terms read or recounted to them, prior to Beier's arrest. Instead, Mundell and Mittendorf knew nothing about the terms of the order other than what, if anything, Susan told them.
 
 
 16
 Beier was charged with violation of a civil protection order, resisting arrest, and malicious injury to property.[4] All charges against Beier were subsequently dismissed by the county prosecutor.
 
 
 17
 Beier thereupon brought a 42 U.S.C. § 1983 action against Mundell, Mittendorf, the City of Lewiston, Nez Perce County, and other officials alleging, among other causes of action, false arrest and excessive force in violation of the Fourth Amendment. The officers moved for summary judgment as to Beier's claims against them for false arrest and excessive force, but the district court denied the motion. The officers now appeal the denial of summary judgment, on qualified immunity grounds, as to the false arrest claim only.
 
 
 18
 With regard to the false arrest claim, the magistrate judge determined that the officers acted unreasonably in failing to review the terms of the protection order even though they had reason to question its scope and applicability, and even though the procedures of the Domestic Violence Crime Protection Act, codified at Idaho Code § 39-6301 et seq., imposed a requirement upon them to review the order before enforcing it. The district court, upon review of the magistrate's Report and Recommendation, agreed that if Beier's version of the facts is credited, (1) no reasonable officer could believe that he possessed sufficient knowledge regarding the terms of the protection order to establish probable cause that it had been violated; and (2) under the circumstances, a reasonable officer would have, at minimum, consulted a copy of the order to ascertain its terms and thereby determine whether a violation had occurred. The district court therefore concluded that the officers were not entitled to prevail on summary judgment on their qualified immunity defense.
 
 II. JURISDICTION
 
 19
 A district court's denial of qualified immunity is an appealable final decision within the meaning of 8 U.S.C. § 1291 to the extent it turns on a question of law. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Even where disputed issues of fact remain, an appellate court may review the qualified immunity ruling by taking the facts in the light most favorable to the non-moving party. See Jeffers v. Gomez, 267 F.3d 895, 905-06 (9th Cir.2001).
 
 
 20
 Beier contends, however, that this is not the usual qualified immunity appeal, because the officers must stand trial on his Fourth Amendment excessive force claim in any case. The two Fourth Amendment claims are so closely related, Beier maintains, that they are not separable for purposes of the collateral order doctrine.[5]
 
 
 21
 We reject this contention. Although an excessive force claim is subject to a "reasonableness" standard under the Fourth Amendment as is a false arrest claim, the two claims require quite different inquiries. See, e.g., Barlow v. Ground, 943 F.2d 1132, 1135-36 (9th Cir.1991) (considering unlawful arrest and excessive force claims separately). To evaluate an excessive force claim, we consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To evaluate whether the police had probable cause to make an arrest, in contrast, we consider the nature and trustworthiness of the evidence of criminal conduct available to the police. Police have probable cause to arrest where "the facts and circumstances within their knowledge and of which they[have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa. See, e.g., Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 921-22 (9th Cir.2001) (use of force may be reasonable even in the absence of probable cause).
 
 
 22
 Given the lack of identity between the excessive force and false arrest claims, Beier's argument is foreclosed by Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). Behrens rejected the argument that because the defendant would have to endure discovery and trial on other claims, a qualified immunity ruling on one claim does not "conclusively determine" the question as required by the collateral order doctrine. 516 U.S. at 311-12, 116 S.Ct. 834. The Supreme Court reasoned that the consequences of such an argument would be "intolerable," because the qualified immunity right would be easily defeated as long as the complaint alleges violation of one clearly established constitutional right. Id. at 312, 116 S.Ct. 834. The Court concluded:
 
 
 23
 The ... right to immunity is a right to immunity from certain claims, not from litigation in general; when immunity with respect to those claims has been finally denied, appeal must be available, and cannot be foreclosed by the mere addition of other claims to the suit.
 
 
 24
 Id. The same concerns would apply in the instant case. If Beier's argument were to prevail, any plaintiff alleging multiple claims arising under a single constitutional provision would be able to circumvent a qualified immunity appeal as long as one of those claims has some merit.
 
 
 25
 We therefore hold that the false arrest claim is separable from the excessive force claim, and that we have jurisdiction to decide the false arrest qualified immunity issue.
 
 III. QUALIFIED IMMUNITY
 
 26
 A qualified immunity analysis addresses two questions: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right," and, if a violation of a constitutional right is found, (2) "whether the right was clearly established." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). We address each of these questions in turn, reviewing the district court's conclusion de novo. See Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994); Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir.2002).
 
 A. Constitutional Violation
 1. Fourth Amendment Principles
 
 27
 That a police officer may arrest a suspect only if he has probable cause to believe a crime has been committed is a bedrock Fourth Amendment precept. See, e.g., Beck, 379 U.S. at 91, 85 S.Ct. 223. An arrest is supported by probable cause if, "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." Grant v. City of Long Beach, 315 F.3d 1081, 1085 (9th Cir.2002) (citation and internal quotation marks omitted); see also Beck, 379 U.S. at 91, 85 S.Ct. 223.
 
 
 28
 At the time of Beier's arrest, the officers possessed the following pertinent information: (1) Mundell had previously been called to the Beier residence on one occasion regarding a domestic dispute; (2) Susan had obtained a protection order against Beier, and the order had been served on Beier; (3) Susan had indicated that Beier was violating the protection order; (4) a copy of the protection order was available at the church; (5) Beier was at the church, in the vicinity of Joseph and Dresden, Susan was also at the church, and Beier had refused to leave; (6) Beier had denied that he was in violation of the protection order and asked Mundell to read the order.
 
 
 29
 The officers contend that this information was sufficient to establish probable cause to believe that Beier was violating a protection order. Specifically, they contend that, with regard to the terms of the protection order, they properly relied upon the "reasonably trustworthy" statements of Susan, an ordinary citizen whose statements should be presumed reliable. Cf. United States v. Angulo-Lopez, 791 F.2d 1394, 1397 (9th Cir.1986) (recognizing that citizen informants are "more reliable than others").
 
 
 30
 Susan's information concerned not observed facts but the content of the judicial order that was the basis for Beier's arrest. Probable cause cannot be established by an erroneous understanding of the law. While an officer may have reasonable suspicion or probable cause even where his reasonable understanding of the facts turns out to be mistaken, see, e.g., United States v. King, 244 F.3d 736, 739 (9th Cir.2001), we have repeatedly held that a mistake about the law cannot justify a stop, let alone an arrest, under the Fourth Amendment. See Alford v. Haner, 333 F.3d 972, 976 (9th Cir.2003) (holding that officers had no probable cause where they arrested suspect for conduct that did not constitute a crime); United States v. Lopez-Soto, 205 F.3d 1101, 1106 (9th Cir. 2000) (holding that officer had no reasonable suspicion for traffic stop where driver "simply was not" violating any law); accord United States v. Mariscal, 285 F.3d 1127, 1130 (9th Cir.2002); King, 244 F.3d at 739; United States v. Twilley, 222 F.3d 1092, 1096 (9th Cir.2000); cf. United States v. Wallace, 213 F.3d 1216, 1220-21 (9th Cir.2000) (suggesting that no probable cause would exist in "cases in which the defendant's conduct does not in any way, shape or form constitute a crime"). As we explained in Mariscal: "If an officer simply does not know the law, and makes a stop based on objective facts that cannot constitute a violation, his suspicions cannot be reasonable. The chimera created by his imaginings cannot be used against the [suspect]." 285 F.3d at 1130.
 
 
 31
 The facts in Alford aptly illustrate the principle that probable cause does not exist where a police officer arrests an individual for activities that do not constitute a violation of the law.[6] In that case, two Washington state troopers noticed during a traffic stop that Alford was tape recording their conversation. 333 F.3d at 975. The troopers informed Alford that they were going to arrest him for illegal tape recording in violation of the Washington Privacy Act. Id. Alford told the officers that he had previously encountered a similar problem and that as a result he had in his glove compartment a copy of the Washington Court of Appeals opinion holding that the Privacy Act does not protect police officers performing official duties. Id. The troopers did not read the opinion. Instead, they proceeded to arrest Alford. Id. Alford turned out to be right: Tape recording a traffic stop is not a crime in Washington. The troopers, we held, did not have probable cause. See id. at 976.
 
 
 32
 Similarly, in cases involving traffic stops, we have held that reasonable suspicion cannot be established by a mistake of law. In Lopez-Soto, for example, we held that a police officer did not have reasonable suspicion for a traffic stop where he erroneously believed that the absence of a vehicle registration sticker visible from the rear violated the Baja California vehicle code. 205 F.3d at 1106. We reasoned:
 
 
 33
 [T]he traffic stop in the case before us was not objectively grounded in the governing law. What Officer Hill reasonably suspected, namely that Lopez-Soto had not affixed a registration sticker to his rear window, simply was not a violation of Baja California law. This cannot justify the stop under the Fourth Amendment.
 
 
 34
 Id. In Twilley, we concluded that reasonable suspicion did not exist where a police officer mistakenly believed that Michigan requires two license plates rather than one. 222 F.3d at 1096. We rejected the government's argument that the officer's mistaken belief could serve as the basis for a stop because the fact that most states require two license plates made his belief a reasonable one, concluding: "[H]is belief was wrong, and so cannot serve as a basis for a stop." Id.
 
 
 35
 In sum, our cases have held that where the arrestee's conduct "does not in any way, shape or form constitute a crime," Wallace, 213 F.3d at 1220, probable cause is lacking.
 
 2. Beier's Arrest
 
 36
 Beier was arrested for violation of a civil protection order, a misdemeanor punishable by a maximum penalty of one year in jail and a fine of $5,000. See Idaho Code § 39-6312(1) (1993). Idaho Code § 39-6312(2) (1993) provides that "[a] peace officer may arrest without a warrant and take into custody a person whom the peace officer has probable cause to believe has violated an order issued under this chapter, if the person restrained had notice of the order." Id. The dispositive question is whether Beier's conduct at the church, as reasonably perceived by the officers, violated any provision of the protection order. If not, the officers lacked legal authority to arrest Beier.
 
 
 37
 The protection order in this case prohibited Beier from committing, threatening, or attempting to commit injury to Susan and her children; contacting or attempting to contact Susan; and going within 300 feet of Susan's residence or workplace. Additionally, the order denied Beier visitation rights with the children. Beier's actions violated none of these provisions.
 
 
 38
 Beier did not violate the order by simply coming to the church when Susan was there, or by being at the church when the children were there. First, the 300-foot restriction applied not to the children but to Susan. Second, this restriction only prohibited Beier from coming within 300 feet of Susan's residence or place of work. It did not apply to the church or indiscriminately to any place other than those mentioned. In addition, Beier did not initiate any contact with Susan. Rather, he sat quietly some distance away.
 
 
 39
 Further, contrary to the officers' contention, Beier did not violate the protection order's limitation on visitation simply because his children initiated contact with him at the church. The officers urge that "visitation" is equivalent to contact, because the Domestic Violence Crime Prevention Act provides that a court may prohibit contact with minor children as part of a protection order, but does not mention "visitation," see Idaho Code § 39-6308 (1993),[7] while the pre-printed form for protection orders provides an option for determining "visitation" but does not specifically provide an option for prohibiting all contact with minor children.
 
 
 40
 This argument is without merit. The pre-printed form does use the term "contact," providing an option for prohibiting the respondent from "contact[ing] or attempt[ing] to contact" the petitioner; that provision clearly prohibits initiating contact with the petitioner. If the order concerning "visitation" meant that the respondent could not initiate contact with his minor children, the drafters would have used the same "contact[ing] or attempt[ing] to contact" language. Instead, the term "visitation" as used in the protection order does not concern a prohibition at all, but refers to the right of the noncustodial parent to court-ordered supervised or unsupervised one-on-one visits with his or her minor children. See, e.g., State Dep't of Health & Welfare v. Roe, 139 Idaho 18, 72 P.3d 858, 862 (2003) (describing various visitation arrangements in which parent was permitted to visit with her daughters one hour once per month at her residence; once every three months at her residence; and at a local Health and Welfare Department Office in the presence of the staff and foster mother); Weiland v. Ruppel, 139 Idaho 122, 75 P.3d 176, 177 (2003) (describing visitation schedule permitting father four visits per week, including some overnight visits, with his son, where the mother was awarded custody). The temporary denial to Beier of any "visitation" rights thus did not mean that he could not contact his children in any way — for example, by telephone or mail. In addition, the pre-printed form provided the issuing judge with the option of ordering "other" conditions not already listed, so a prohibition on contacting the children could have been added, but was not.
 
 
 41
 Further, even if the protection order had prohibited Beier from "contacting" Joseph and Dresden, Beier did not do so. Joseph and Dresden were not even at the church when Beier arrived; they came later. Once they arrived, it was the children who initiated "contact" with Beier, not the converse. This distinction regarding initiation is reflected in the protection order itself. For example, the order's restriction on coming within 300 feet of Susan's residence and workplace applies "even if invited by" Susan, whereas the restriction on contacting or attempting to contact Susan contains no such language.
 
 
 42
 There is, consequently, simply no viable reading of the order pursuant to which Beier was in violation. The officers therefore had no objective basis to arrest Beier for violating the protection order. Under the totality of the circumstances, any prudent officer would have concluded that there was no fair probability that Beier had committed a crime. Accordingly, we hold that the officers violated the Fourth Amendment by arresting Beier without probable cause.
 
 B. Clearly Established Right
 
 43
 " `[C]learly established' for purposes of qualified immunity means that `[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Wilson v. Layne, 526 U.S. 603, 614-15, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034) (internal quotation marks and citations omitted). The "salient question" is whether the state of the law in June of 1997 gave the officers fair warning that their actions were unconstitutional. See Hope, 536 U.S. at 741, 122 S.Ct. 2508; see also Devereaux v. Abbey, 263 F.3d 1070, 1075 (9th Cir.2001) (en banc) ("[W]hat is required is that government officials have `fair and clear warning' that their conduct is unlawful.") (citation omitted). In the context of this case, the qualified immunity inquiry requires us to consider whether, under the circumstances, it was objectively reasonable for the officers to believe that there was probable cause to arrest Beier for violating a protection order whose contents they had not ascertained. See Alford, 333 F.3d at 977 (addressing whether in light of the facts and circumstances confronting the officers, it was objectively reasonable to conclude that the arrest in question was supported by probable cause). We conclude that the unlawfulness of their actions would have been apparent to a reasonable officer.
 
 
 44
 In Guerra v. Sutton, 783 F.2d 1371 (9th Cir.1986), we held that while law enforcement officers may rely upon the representation of a responsible law enforcement officer that a proper warrant exists, they have "a further duty to inquire as to the nature and scope of the warrant" because "[t]he mere existence of a warrant ... provide[s] little useful information to the officers." Id. at 1375. We concluded:
 
 
 45
 We are not willing to extend qualified immunity to the conduct of INS agents acting under the assumed authority of a warrant where such agents have not made inquiry as to the nature and scope of that warrant. An INS agent who conducts a search or makes an arrest without knowledge of the details of the warrant under which he presumes to act violates clearly established law.
 
 
 46
 Id.; see also Marks v. Clarke, 102 F.3d 1012, 1030 (9th Cir.1997) (noting that in Guerra, "we denied the agents immunity because it was clear that they had not sought to determine specific information regarding what the warrant authorized them to do"); cf. United States v. Whitten, 706 F.2d 1000, 1009-10 (9th Cir.1983) ("Officers conducting a search should read the warrant or otherwise become fully familiar with its contents.").
 
 
 47
 The facts here are precisely analogous: The officers confirmed with the dispatcher that a protection order against Beier had been issued and served, but made no attempt to ascertain its terms from authorized personnel or by reading the readily available document.
 
 
 48
 Protection orders, like warrants, are not stamped from a single template. The state statute that authorizes domestic protection orders spells out an array of options for relief that may be ordered by a court entering a protection order. See Domestic Violence Crime Prevention Act, Idaho Code §§ 39-6308 (1993) (ex parte relief) and 39-6306(1) (Supp.1997) (relief after a hearing).[8] The court may "grant such ... relief as the court deems proper," Idaho Code § 39-6308(1) (1993), including but not limited to the array of listed options; the court is specifically given the discretion to "[o]rder[] other relief as the court deems necessary for the protection of a family or household member." Idaho Code § 39-6308(1)(d) (1993); see also Idaho Code § 39-6306(1)(e) (Supp.1997) (setting forth similar options for protection orders issued after a hearing). This statutory scheme provides for tailoring protection orders to the needs of the particular domestic violence victim or victims. Without reading or otherwise properly determining the precise terms of a particular order, there is no way to tell how that order was crafted, and, therefore, no way to know whether it was violated.
 
 
 49
 Law enforcement officers who act to enforce such a protection order therefore have a responsibility to familiarize themselves with the order's precise contents through some official source. A police officer who does not personally read such an order, for example, may fulfill his duty by obtaining information from authorized personnel — such as a supervisor or police dispatcher — who have access to the terms of the order. See Marks, 102 F.3d at 1029-30; Guerra, 783 F.2d at 1375.
 
 
 50
 So recognizing, the Domestic Violence Crime Prevention Act provides that "[l]aw enforcement agencies shall establish procedures reasonably adequate to assure that an officer approaching or actually at the scene of an incident of domestic violence may be informed of the existence and terms of [the] protection order." Idaho Code § 39-6311(3) (Supp.1997) (emphasis added). The pre-printed protection order form advises the person protected in capital letters: "ATTENTION PETITIONER KEEP A COPY OF THIS ORDER IN YOUR POSSESSION IN ORDER TO ASSIST PEACE OFFICERS," similarly reflecting the understanding that police officers must have a means to ascertain the terms of the protection order before enforcing it.
 
 
 51
 Lewiston police officers, moreover, are trained to ascertain the terms of protection orders. Mundell testified that his training included field training on reading, understanding, and serving protection orders. He was instructed that officers should read a domestic violence protection order to make a determination about whether or not a suspect is violating it. Mittendorf stated, similarly, that although there was no formal policy requiring officers to read a protection order when enforcing one, they "had to know the contents of it.... [I]t was ... an unwritten policy that we would try to substantiate the order. Many times, we would call the sheriff's office ... or the dispatch.... [T]hey would have the main points of the order [in the computer system] and we'd get part of the information."
 
 
 52
 Contrary to the officers' contention, cases regarding the presumptive reliability of factual information from ordinary citizens do not detract from the conclusion that Mundell and Mittendorf violated clearly established law by relying on the victim's unsubstantiated claim that there had been a violation of the protection order. True, under some circumstances reliance upon factual statements by citizen informants is reasonable. See, e.g., Angulo-Lopez, 791 F.2d at 1397. Uncritical reliance upon the legal conclusions of lay citizens, however, is not reasonable. Rather, law enforcement officers, not ordinary citizens, are charged with enforcing the law, and cannot reasonably do so if they make no attempt to ascertain the applicable prohibitions.
 
 
 53
 The officers also cite out-of-circuit court of appeals and district court cases in which police officers were granted qualified immunity for arrests based on recalled warrants, where the arrestee provided the arresting officers with notice of the recall. In those cases, the police officers reasonably relied upon information from official warrant tracking services that later turned out to be inaccurate. See, e.g., Duckett v. City of Cedar Park, 950 F.2d 272, 280 (5th Cir.1992) (concluding that police officer acted reasonably in disregarding claims of arrestee and his family that the warrant had been recalled, where officer confirmed the validity of the warrant through official channels); Mitchell v. Aluisi, 872 F.2d 577, 578-79 (4th Cir.1989) (concluding that arrest based on facially valid warrant did not violate due process, where sheriff's office had not received notice that the warrant had been, as the arrestee had asserted, cancelled); Lauer v. Dahlberg, 717 F.Supp. 612, 614 (N.D.Ill.1989) (concluding that officer was entitled to rely on information received from LEADS despite having been presented with an uncertified copy of a warrant recall order), aff'd, 907 F.2d 152 (7th Cir.1990). Here, in contrast, there was no facially valid document authorizing Beier's arrest. In addition, these cases indicate that when there is a conflict between legal information obtainable from official channels and legal information obtained from lay citizens, police officers may reasonably rely upon officially-obtained information. The officers here did exactly the opposite: On their account, they relied upon Susan's interpretation of the protection order and did not confirm this information through official channels.
 
 
 54
 Confirmation was readily available. Mundell confirmed with the dispatcher that the protection order had been issued and served, but neither he nor Mittendorf asked the dispatcher what the protection order provided. Nor did either of them consult the copy of the order that they knew was in Susan's purse. The officers failed to confirm the terms of the protective order even though they knew that Beier disputed that he was violating the protection order, and even though Beier had specifically requested that they read the order. No exigent circumstances prevented them from confirming the contents of the order. See Alford, 333 F.3d at 979 (noting lack of exigent circumstances).[9]
 
 
 55
 Finally, the officers argue that their arrest of Beier was reasonable given the lack of case law clearly establishing the distinction between prohibitions on "visitation" and "contact." The relevant question at this stage of the qualified immunity analysis, however, is whether a reasonable officer could have believed Beier's arrest was supported by probable cause, "in light of clearly established law and the information the [arresting] officers possessed." Anderson, 483 U.S. at 641, 107 S.Ct. 3034 (emphasis added). Mundell and Mittendorf did not know the terms of the protection order, because they made no attempt to learn them.
 
 
 56
 The officers are not entitled to qualified immunity on the basis of a mistaken interpretation of the order, even a reasonable one, that they did not actually make. To shift the focus of the inquiry, as the officers would have us do, away from their actual actions to hypothetical decisions they would have faced had they behaved reasonably cannot be reconciled with the policy precepts underlying the qualified immunity doctrine.
 
 
 57
 The qualified immunity doctrine rests on a balance between, on the one hand, society's interest in promoting public officials' observance of citizens' constitutional rights and, on the other, society's interest in assuring that public officials carry out their duties and thereby advance the public good. Without some room to make mistaken but reasonable decisions, the fear of making an unforeseeable error and thereby incurring liability could dissuade public officials from pursuing their duties with vigor. Police officers charged with protecting public safety, for example, could become bystanders rather than law enforcers whenever faced with any but the most clear circumstances implicating constitutional rights. "The concept of immunity... assume[s] that it is better to risk some error and possible injury from such error than not to decide or act at all." Scheuer v. Rhodes, 416 U.S. 232, 242, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).
 
 
 58
 Under the incentive structure thus embodied in the qualified immunity doctrine, it is of no moment that the officers might have reached the same outcome had they read the protection order. The officers' error in arresting Beier without learning the terms of the protection order was, for the reasons already surveyed, not one a reasonably competent officer should make. Assuming that it would have been reasonable for an officer who did read or otherwise learn the terms of the protection order to conclude that it had been violated, which we doubt, no officer faced with that down-the-line decision would be dissuaded from acting in accord with his or her reasonable understanding of the document because officers who did not read the document at all were liable in damages for failing to do so. Conversely, knowing they will be liable if they do not take the trouble to ascertain the terms of a protection order, officers will be encouraged to do so; while some may read such orders erroneously but reasonably, most, presumably, will interpret the terms properly, with the result that citizens' constitutional rights will be protected. To accord qualified immunity here because the officers in this case or other officers might have made a different, reasonable mistake with the same outcome would be to encourage police officers to arrest citizens without ascertaining the applicable legal prohibitions, thereby compromising the protection of the constitutional rights of citizens, with no countervailing benefit in advancing the public good.
 
 
 59
 There is, consequently, no basis in the qualified immunity doctrine for insulating the officers in this case from liability for fear of dissuading them or other officers from enforcing protection orders in the future. Instead, the competing interest in compensating citizens for violations of constitutional rights becomes paramount and requires the denial of qualified immunity.
 
 
 60
 We conclude that the officers could not have reasonably believed that Beier's arrest complied with the Fourth Amendment. Any reasonably competent officer would have ascertained the terms of the protection order before arresting Beier for failing to comply with it. Accordingly, the officers are not entitled to qualified immunity.
 
 IV. CONCLUSION
 
 61
 For the foregoing reasons, we AFFIRM the district court's denial of the officers' motion for summary judgment on Beier's false arrest claim, and REMAND for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The terms of the order were set forth on a pre-printed "Temporary Protection Order" form. The form provided a number of optional terms to be selected, by checking the appropriate boxes, by the judge entering the order
 
 
 [2]
 The district court incorrectly stated in its Order of May 10, 2002 (adopting the magistrate's Report and Recommendation) that the protection order required Beier to stay at least 300 feet away from Susan herself at all times, rather than only from Susan's home or workplace
 
 
 [3]
 Susan's testimony on what she told Mundell was inconsistent and is disputed by the parties. She stated variously that she told Mundell that: Beier was violating the order by being in contact with Joseph and Dresden; Beier was violating the order by being within a certain distance of her and the children; and Beier was violating the order because he should not have been at the church. She later signed an affidavit stating that all she could remember of her conversations with Mundell was that she told him she had a restraining order against Beier and asked Mundell to come help her with the problem. As will appear, on our view of the case, these discrepancies do not matter as the officers were not entitled to rely on her representations in lieu of ascertaining the terms of the order for themselves
 
 
 [4]
 Beier allegedly kicked out a patrol car window after his arrest
 
 
 [5]
 Mitchell held that qualified immunity appeals come within the collateral order doctrine, which provides that a decision is a "final decision" under 28 U.S.C. § 1291 if it "is effectively unreviewable on appeal from a final judgment," "conclusively determine[s] the disputed question," and "involves a clai[m] of right separable from, and collateral to, rights asserted in the action." 472 U.S. at 526-27, 105 S.Ct. 2806 (internal quotation marks and citation omitted); see also Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).
 
 
 [6]
 We note that an officer's correct application of a law later found to be unconstitutionaldoes supply probable cause. See Michigan v. DeFillippo, 443 U.S. 31, 38, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) ("Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by law enforcement officers concerning its constitutionality — with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws."). This case does not present such a question, as the officers relied not upon a presumptively valid law later declared unconstitutional, but on their unsubstantiated understanding of the terms of a protection order imposed under state law. Cf. King, 244 F.3d at 741-42 (holding that even a reasonable but mistaken interpretation of the law cannot form the basis for reasonable suspicion).
 
 
 [7]
 Idaho Code § 39-6308(1) (1993) reads in pertinent part:
 Where an application under this section alleges that irreparable injury could result from domestic violence if an order is not issued immediately without prior notice to the respondent, the court may grant an ex parte temporary protection order ..., and grant such other relief as the court deems proper, including an order:
 (a) Restraining any party from committing acts of domestic violence;
 (b) Excluding any party from the dwelling shared or from the residence of the other until further order of the court;
 (c) Restraining any party from interfering with the other's custody of the minor children or from removing the children from the jurisdiction of the court;
 (d) Ordering other relief as the court deems necessary for the protection of a family or household member, including orders or directives to a peace officer, as allowed under this chapter;
 (e) Restraining the respondent from contacting, molesting, interfering with or menacing the minor children whose custody is awarded to the petitioner;
 (f) Restraining the respondent from entering any premises when it appears to the court that such restraint is necessary to prevent the respondent from contacting, molesting, interfering with or menacing the petitioner or the minor children whose custody is awarded to the petitioner; and/or
 (g) Restraining the respondent from taking more than personal clothing and toiletries and any other items specifically ordered by the court.
 All citations to the Idaho Code are to the 1993 edition and to the 1997 Supplement where relevant, reflecting the version that was in force in 1997.
 
 
 [8]
 For example, see the text of Idaho Code §§ 39-6308(1) (1993), reproduced herein atsupra n. 7.
 
 
 [9]
 We do not decide, asAlford did not, whether exigent circumstances could ever render reasonable an officer's failure to ascertain the terms of the applicable legal prohibition, if it later turns out that there was no probable cause for the arrest. The question is unlikely ever to arise in the protection order context. Presumably if an individual is acting in a violent or threatening manner, creating exigent circumstances, probable cause for arrest would be established regardless of whether a protection order was violated.