**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM H. CONNER,
        *Plaintiff-Appellee,*

        v.

STEVE HEIMAN and RUSS NEIL,
        *Defendants-Appellants,*

        and

HARRAH'S OPERATING COMPANY,
INC.,

        *Defendant.*

No. 10-17545

D.C. No.
3:08-cv-00633-
RCJ-RAM

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Chief District Judge, Presiding

Argued and Submitted
January 11, 2012—San Francisco, California

Filed March 9, 2012

Before: John T. Noonan and Milan D. Smith, Jr.,
Circuit Judges, and Jed S. Rakoff, Senior District Judge.*

Opinion by Judge Rakoff

---

*The Honorable Jed S. Rakoff, Senior District Judge for the U.S. District Court for Southern New York, sitting by designation.

## COUNSEL

John S. Michela, Senior Deputy Attorney General of Nevada, Reno, Nevada, for the defendants-appellants.

Jeffrey A. Dickerson, Reno, Nevada, for the plaintiff-appellee.

## OPINION

RAKOFF, Senior District Judge:

Plaintiff-Appellee William H. Conner sues Steve Heiman and Russ Neil, two Nevada Gaming Control Board agents, under 42 U.S.C. § 1983. Conner claims that Heiman and Neil violated his rights under the Fourth Amendment by arresting him without probable cause to believe that he had committed a crime. Conner also alleges that Heiman and Neil conspired with Harrah's Operating Company ("Harrah's") to violate his rights. On October 20, 2010, the district court denied Heiman's and Neil's motion for summary judgment based on the defense of qualified immunity. Heiman and Neil now appeal from that decision.

We hold that the district court erred when it reserved the issue of whether Heiman and Neil had qualified immunity for the jury even though the parties did not materially dispute what facts Heiman and Neil knew when they arrested Conner. We further hold that Heiman and Neil did not violate clearly established rights by arresting Conner. Accordingly, Heiman and Neil are entitled to qualified immunity, and we reverse the district court's denial of their motion for summary judgment.

BACKGROUND

At summary judgment, the undisputed evidence showed the following. On July 19, 2008, Conner played baccarat at Harrah's casino. Conner made more than one bet at a first baccarat table, one bet at a second table, and many bets at a third table. While Conner was playing at the third table, two Harrah's employees, Sang Lee and Linda Coffee, separately indicated that they wished to speak with him. Conner declined to speak to Lee. A few minutes later, Coffee stopped the game Conner was playing and advised Conner that the dealer at the second baccarat table had overpaid him on his wager.

It was Lee who discovered the overpayment when he heard that Conner had won $2,850 on a single bet at the second table, whereas, because that table had a wager limit, Conner could have won at most $1,900 on a single wager. To confirm that Conner had received an overpayment, Lee called the casino's surveillance department, which confirmed the overpayment. Coffee then asked Conner to return the overpayment. Conner refused to do so, inquiring into the basis for Harrah's belief that he had received an overpayment. According to a statement provided by Lee, Conner yelled and responded rudely. According to a similar statement provided by Coffee, Conner was "extremely defensive" and "upset." Instead of returning the overpayment, Conner made an appointment to speak with one of Harrah's games managers.

The next day, Conner met with Jim Webbert, a Harrah's games manager, who reiterated that Harrah's had overpaid Conner and stated that this had been confirmed on videotape. Webbert refused, however, to show Conner the video of the overpayment, and Conner, in turn, continued to refuse to return the overpayment. On July 23, 2008, Webbert reported the incident to the State Gaming Control Board. Heiman, who responded to the report, informed Webbert that, if Conner refused to return the overpayment after Harrah's informed

him of its mistake, then the Gaming Control Board could investigate the incident as a criminal matter.

When, on August 3, 2008, Heiman received further notification from Webbert that Conner still refused to return the overpayment, Heiman opened an investigation. Heiman reviewed the surveillance video to confirm that the overpayment had, in fact, occurred. Heiman also reviewed the voluntary statements made by Lee and Coffee, which described how Lee had learned that Conner had received an overpayment and what had happened when Coffee requested that Conner return the overpayment.

On August 4, 2008, Heiman called Conner. Over the phone, Heiman informed Conner that, while Conner had committed no crime by accepting the overpayment, retaining the overpayment at this point would constitute theft under Nevada law. Conner, however, refused to return the overpayment unless he could see the evidence confirming that he had received it. Conner also asked if Heiman was in Harrah's "back pocket" and whether he did the casino's "dirty work." After this conversation, Heiman concluded that he had probable cause to arrest Conner for theft. Heiman briefed his supervisor, Senior Agent Russ Neil, on his investigation, showing him the videotape of the overpayment. Neil agreed with Heiman's conclusions.

On August 6, 2008, Conner appeared at the Gaming Control Board Office of his own volition and requested to speak with Dave Andrews, who was Neil's and Heiman's supervisor, about the phone call he had received from Heiman. Neil informed Conner that Andrews was not available. Neil then frisked Conner. According to Conner, Neil was "dominant and controlling," and the search he conducted offended and unsettled Conner. In his deposition, Conner stated that Heiman and Neil informed him that, if he did not pay Harrah's $950, they would charge him with a felony and take him to jail. Neil and Heiman did not let Conner view the video of the

overpayment, instead informing him that they would present it only as required by the legal process. When Conner asked to go to Harrah's in his own car, Heiman and Neil refused, placing him under arrest. Heiman and Neil then drove Conner to Harrah's, where Conner returned the overpayment to Webbert. As Neil left Harrah's, he said, "I'll call you later, buddy," to Webbert. Then, Heiman and Neil returned Conner to his car, and the parties separated.

On this record, the district court concluded that, although "there is no question of fact that a reasonable officer could have believed Conner had committed the requisite actus reus for theft, a reasonable jury could find that there was no probable cause to believe that Plaintiff had the requisite mens rea for theft." Specifically, the court concluded that Conner's "behavior was consistent with a person who is accidentally overpaid, does not realize it, has no way to confirm or deny it when confronted . . . who is understandably defensive when accused of theft, and who is understandably suspicious when his accuser refuses to show him alleged evidence it possesses." Based on this conclusion, the district court denied Neil's and Heiman's motion for summary judgment on Conner's Fourth Amendment claim. With respect to the § 1983 conspiracy claims, the district court again denied the appellants' motion for summary judgment, concluding that "there remains a dispute as to whether the Defendants cooperated when Harrah's reported a crime and the State Defendants then investigated it, arrested Conner on probable cause, and facilitated the return of Harrah's money (a civil debt) via the threat of criminal prosecution."

Neil and Heiman appeal from the district court's decision. The Court has jurisdiction to hear this appeal because "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*,

472 U.S. 511, 530 (1985).[1] We review a district court's denial of a qualified immunity defense *de novo*. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993).

## DISCUSSION

A.  Whether the District Court Erred by Reserving the Question of Qualified Immunity for the Jury

Qualified immunity is "an *immunity from suit* rather than a mere defense to liability." *Mitchell*, 472 U.S. at 526 (emphasis in original). Thus, "[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). While this Court at one time was of the view that district courts should not decide the issue of qualified immunity unless a rational jury could reach only one conclusion, the Supreme Court, in *Hunter v. Bryant*, rejected that approach for two reasons. 502 U.S. 224, 227-28 (1991); *see also Act Up!/Portland*, 988 F.2d at 872. First, the Supreme Court found that such an approach too often failed to protect defendants from the expenses of trial. *Hunter*, 502 U.S. at 228. Second, the Supreme Court noted that the question is "whether the agents acted reasonably under settled law

---

[1]Conner argues that the Court lacks jurisdiction over this appeal because the district court's denial of Heiman's and Neil's qualified immunity defense turned upon an issue of fact rather than of law. *See Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). But even though the district court posited the existence of a "question of material fact," its analysis focused on whether the inferences Heiman and Neil could reasonably have drawn were "consistent" with their knowledge of the facts. As discussed below, where "the only disputes involve what inferences properly may be drawn from . . . historical facts" that are not in dispute, a qualified immunity claim turns on a legal question that a court must resolve. *Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-80 (9th Cir. 2003). Accordingly, the Court has jurisdiction under *Mitchell v. Forsyth*.

in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed." *Id.*

[1] After *Hunter*, this Court altered its approach to resolving questions of qualified immunity. *See Act Up!/Portland*, 988 F.2d at 873. Under the current approach, a district court should decide the issue of qualified immunity as a matter of law when "the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts." *Peng*, 335 F.3d at 979-80. Only where "historical facts material to the qualified immunity determination are in dispute" should the district court submit the issue to a jury. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1211 (9th Cir. 2008).[2]

[2] Here, the district court found that a "reasonable jury could find a lack of probable cause at this stage," not because

---

[2]While certain language in *Torres* might suggest that a jury should decide what inferences a reasonable officer may draw from certain evidence, close analysis of the decision refutes such an interpretation. In *Torres*, the Court refused to decide the issue of qualified immunity because questions of fact existed regarding (1) whether a witness had "positively identified" the suspect, (2) whether a different witness had informed the officers that the suspect had recently joined a gang, and (3) whether the officers could have reasonably believed "that in [a] group photo [the suspect] was making a gang sign despite the fact that only one of [his] fingers [was] visible in the photo." *Id.* While the Court's discussion of what officers could have reasonably believed about the photo might have suggested that the jury would decide which inferences the officers could draw, the context of this discussion clarifies that the reasonableness of the officers' interpretation of the photograph turned upon resolution of the factual disputes, *i.e.*, determination of what the witnesses had told the officers. Thus, *Torres* stands for the principle that the district court should submit the question of qualified immunity to the jury only if the parties materially dispute what officers knew at the time they arrested a suspect. Put another way, while determining the facts is the jury's job (where the facts are in dispute), determining what objectively reasonable inferences may be drawn from such facts may be determined by the court as a matter of logic and law.

the parties disputed what Heiman and Neil knew about Conner's actions, but instead because, in the court's view, those actions were "consistent" with the inference that Conner had committed no crime. In doing so, the Court implicitly acknowledged that no material dispute existed concerning what facts Heiman and Neil knew. Instead, the only material disputes concerned "what inferences properly may [have] be[en] drawn from those historical facts." *Peng*, 335 F.3d at 979-80. Accordingly, under *Peng*, the district court should have decided "whether probable cause existed" when Neil and Heiman arrested Conner, and reserving this question for the jury was error. *Id.*

> B.  Whether Neil and Heiman Had Probable Cause to Arrest, and Thus Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson*, 555 U.S. at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, in order to determine whether qualified immunity protects a government official, a court must decide, first, whether a plaintiff has produced evidence showing that the official violated a constitutional right and, second, whether that right was "clearly established" at the time of the alleged misconduct. *Id.* at 232.

**[3]** In the Fourth Amendment context, "an arrest is lawful . . . only if it is accompanied by probable cause to believe that the arrestee has committed, or is committing, an offense." *Torres*, 548 F.3d at 1207 n.7. Probable cause exists "if, 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.' " *Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2004) (quoting *Grant v. City of Long Beach*, 315 F.3d 1081, 1085 (9th Cir. 2002)). While the requirement of probable cause is

clearly established, the Supreme Court has specified that the application of that requirement must be clearly established in a particularized context. *Saucier*, 533 U.S. at 202. Thus, whether a right is clearly established turns on "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

**[4]** Here, Heiman and Neil argue that, based on all the facts known to them, they could have reasonably concluded that a "fair probability" existed that Conner had committed theft in violation of Nevada Revised Statute § 205.0832(1)(a). Section 205.0832(1)(a) criminalizes "knowingly . . . [c]ontrol[ing] any property of another person with the intent to deprive that person of the property." The district court concluded that, while there was "no question" that Heiman and Neil had probable cause to believe that Conner had committed the actus reus of theft, "a reasonable jury could find that there was no probable cause to believe that Plaintiff had the requisite mens rea for theft," presumably because Conner's behavior was "consistent" with that of an innocent person. The fact that reasonable people could draw different conclusions based on Conner's behavior, however, is irrelevant to the probable cause analysis. *See Hunter*, 502 U.S. at 228 ("[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed . . . ."). The only question is whether Neil and Heiman could have reasonably concluded, under the totality of the circumstances, that a "fair probability" existed that Conner knew that he controlled Harrah's property and intended to deprive Harrah's of that property.[3] Whether the opposite con-

---

[3]Neil and Heiman invite the Court to find that they did not need to have probable cause concerning Conner's mens rea. *Cf. Rodis v. City, County of San Francisco*, 558 F.3d 964, 970 (9th Cir. 2009) (noting that, in the unique context of counterfeiting, other circuits have found that knowledge that a suspect passed a counterfeit note generates probable cause to arrest the suspect). Because we find that Neil and Heiman could have reasonably concluded that they had probable cause to believe that Conner had the requisite mens rea, we need not reach the question of whether probable cause concerning his mens rea was required for an arrest.

clusion was also reasonable, or even more reasonable, does not matter so long as the Neil's and Heiman's conclusion was itself reasonable.

**[5]** We think Neil and Heiman could have reasonably concluded that they had probable cause to believe that Conner knowingly controlled Harrah's property and intended to deprive Harrah's of that property. Heiman not only personally reviewed the available evidence, including the videotape, but also asked Neil to review his findings. The evidence they reviewed showed that Conner had received an overpayment and that the nature of the overpayment—payment of $950 more than Conner could have won on the maximum bet—was one that would have been obvious to most players. Moreover, Neil and Heiman knew that multiple Harrah's employees had informed—or attempted to inform—Conner of the overpayment, and that, when confronted by Lee and Coffee, Conner responded rudely and defensively. On the basis of this evidence, Neil and Heiman could have reasonably concluded that a fair probability existed that Conner knew that Harrah's had overpaid him. They could have reasonably suspected, for example, that Conner cynically hoped to keep the money or that he did not want to accede to Harrah's demands simply because he felt offended by the manner in which Harrah's employees confronted him. Thus, a reasonable officer would not find it "clear" that Neil and Heiman violated the Fourth Amendment when they concluded that they had probable cause to arrest Conner.

**[6]** Because Neil and Heiman did not violate clearly established Fourth Amendment rights, qualified immunity protects them from Conner's claims under § 1983, and they are entitled to summary judgment on those claims. The finding that Neil and Heiman have qualified immunity also bars Conner's § 1983 conspiracy claim. As this Court noted in *Haldeman v. Golden*, a § 1983 conspiracy claim "is not a means of holding state actors liable on claims from which they are otherwise immune." 359 F. App'x 777, 780 (9th Cir. 2009). Accord-

ingly, Neil and Heiman are also entitled to summary judgment on Conner's § 1983 conspiracy claim.

## CONCLUSION

**[7]** For the foregoing reasons, we find that the district court erred when it reserved the question of appellants' qualified immunity defense for the jury. We further find that, because Neil and Heiman could have reasonably concluded that they had probable cause to believe that Conner committed theft in violation of Nevada Revised Statute § 205.0832(1)(a), qualified immunity entitles them to summary judgment on all of Conner's claims. Accordingly, we reverse the decision of the district court and direct it to enter judgment dismissing all claims against Heiman and Neil.

**REVERSED.**