**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Maurice Lashaw KING, Defendant–**
**Appellant.**

**No. 00–30113.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 8, 2001

Filed March 28, 2001

Michael S. Taggart, Federal Public Defender's Office, Anchorage, Alaska, for the defendant-appellant.

Kevin R. Feldis, Assistant United States Attorney, Anchorage, Alaska, for the plaintiff-appellee.

Before: RYMER, THOMAS, and McKEOWN, Circuit Judges.

McKEOWN, Circuit Judge:

This case requires us to decide whether there was reasonable suspicion for a traffic stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where the officer misapprehended the traffic law that was the basis for the stop. In view of our recent decisions in *United States v. Rojas–Millan*, 234 F.3d 464 (9th Cir.2000), and *United States v. Twilley*, 222 F.3d 1092 (9th Cir.2000), we conclude that the officer's mistake of law regarding the applicable traffic ordinance precludes a finding of reasonable suspicion. Therefore, we reverse the district court's denial of defendant Maurice King's motion to suppress.

## BACKGROUND

In September 1999, police officer Dennis Allen was on duty in his patrol car, searching for stolen rental cars and enforcing local traffic laws in the Mountain View area of Anchorage, Alaska. While driving along a side street, he noticed a young, black, male, later determined to be King, driving a car with a Disabled Persons Parking Identification Placard hanging from the car's rearview mirror. Allen became suspicious, in part because he did not typically associate disabled parking placards with young persons.

As the car passed him, Allen continued watching it in his rearview mirror and observed a "Dollar Rent A Car" sticker on the back bumper. He radioed the license plate number to police dispatch to determine whether the car had been reported stolen, but it had not. Nevertheless, Allen harbored suspicions and continued to follow the car. For the few blocks that Allen did so, King obeyed all traffic signs and did not drive erratically. When Allen

turned on his lights to initiate a traffic stop, King pulled over immediately.

Allen later testified that he pulled the car over for three reasons: (1) he did not associate disabled parking placards with younger people, which made him suspicious that the permit may have been stolen; (2) he wanted to advise the driver that the law prohibited driving with the placard hanging from the rearview mirror; and (3) despite the report from police dispatch, he was suspicious that the rental car may have been stolen.[1]

As Allen approached the stopped vehicle, he noticed that King was not wearing a seatbelt. Allen asked him for identification. Mr. King provided Allen with a rental agreement signed by his stepfather. He also informed the officer that the parking placard belonged to a family member. Although Mr. King did not have his driver's license with him, he gave Allen his correct name, address, phone number, date of birth, and Social Security number. King was cooperative throughout the stop and questioning.

A records search revealed an outstanding warrant for King's arrest. After calling for backup, Allen asked King to exit the car, and another officer conducted a patdown search for weapons. During the patdown, the officer found crack cocaine in King's pocket.

King was charged with one count of Felony Possession of Crack Cocaine, a violation of 21 U.S.C. § 844(a). He filed a motion to suppress the drugs on the ground that, because he did not violate any Anchorage traffic laws, Allen did not have the requisite articulable suspicion to conduct the stop. After an evidentiary hearing, the magistrate judge recommended denial of the motion. The district court, acknowledging that "[t]his is a very close case," adopted the magistrate judge's recommendation and denied the motion, concluding that the Anchorage Municipal Code prohibited having a disabled placard hanging from the rearview mirror while driving. Mr. King pled guilty to the possession charge, reserving his right to appeal the denial of the motion to suppress.

## ANALYSIS

This appeal boils down to whether Allen had reasonable suspicion to believe that King had violated a traffic law. If Allen did not have reasonable suspicion, the stop was an unlawful seizure in violation of the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."). Although *Whren* permits an officer to conduct a pretextual traffic stop as a means to uncover other criminal activity, the officer must reasonably suspect a traffic law violation. *See id.* at 812–13, 116 S.Ct. 1769. Reasonable suspicion requires " 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *Twilley*, 222 F.3d at 1095 (quoting *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir.2000) (internal quotation marks and citation omitted)). In the context of a motion to suppress, we conduct de novo review of the district court's reasonable suspicion determination. *See United States v. Lopez–Soto*, 205 F.3d 1101, 1103 (9th Cir.2000).

Since *Whren*, we have considered a number of scenarios involving reasonable suspicion to initiate a traffic stop. We have upheld reasonable suspicion when an officer was correct about the traffic law and the facts observed. *See, e.g., Rojas–Millan*, 234 F.3d at 469 (concluding that officer's "reasonable suspicion of a viola-

---

1. The United States conceded on appeal that the only legitimate basis for reasonable suspicion to stop the car was the alleged violation of Anchorage traffic law by driving with a parking placard hanging from the rearview mirror.

tion of [state] law was 'objectively grounded in the governing law,' and his decision to make the stop was lawful") (quoting *Lopez–Soto,* 205 F.3d at 1106). Similarly, an officer's correct understanding of the law, together with a good-faith error regarding the facts, can establish reasonable suspicion. *See Twilley,* 222 F.3d at 1096 n. 1 ("A factual belief that is mistaken, but held reasonably and in good faith, can provide reasonable suspicion for a traffic stop.... [T]he distinction between a mistake of fact and a mistake of law [is] crucial to determining whether reasonable suspicion exists to stop a vehicle."). We have also upheld reasonable suspicion when an officer was mistaken about the exact content of the law, but the defendant was still in violation of the law. *See, e.g., United States v. Wallace,* 213 F.3d 1216, 1220 (9th Cir.) ("The issue is not how well [the officer] understood California's ... laws, but whether he had objective, probable cause to believe that [there was], in fact, [a] violation."), *cert. denied,* —— U.S. ——, 121 S.Ct. 418, 148 L.Ed.2d 323 (2000).

■ In *Wallace,* we recognized that officers are "not taking the bar exam" and may be wrong about precisely why an act is illegal while still having a reasonable suspicion that it is illegal. *Id.* If, however, "an officer makes a traffic stop based on a mistake of law, the stop violates the Fourth Amendment." *Twilley,* 222 F.3d at 1096; *accord Lopez–Soto,* 205 F.3d at 1106 (concluding that a mistake of law "cannot justify the stop under the Fourth Amendment"). Even a good faith mistake of law by an officer cannot form the basis for reasonable suspicion, because "there is no good-faith exception to the exclusionary rule for police who do not act in accordance with governing law." *Lopez–Soto,* 205 F.3d at 1106. As the Fifth Circuit has explained:

> The rule articulated by the Supreme Court in *Whren* provides law enforcement officers broad leeway to conduct searches and seizures regardless of whether their subjective intent corresponds to the legal justifications for their actions. But the flip side of that leeway is that the legal justification must be objectively grounded.

*United States v. Miller,* 146 F.3d 274, 279 (5th Cir.1998) (footnote omitted).

We have not yet explicitly ruled on a case, like the one before us, where an officer was mistaken about a statute not yet interpreted by the courts. Nonetheless, the principles set forth in *Twilley* and *Lopez–Soto* are controlling. In *Twilley,* a California police officer stopped a car with a single Michigan license plate, which the officer believed to be a violation of Michigan (and thus California) law. *See Twilley,* 222 F.3d at 1094. As it turned out, however, the officer was mistaken; Michigan does not require two plates. *See id.* at 1096. We held that the stop violated the Fourth Amendment, noting that "a belief based on a mistaken understanding of the law cannot constitute the reasonable suspicion required for a constitutional traffic stop." *Id.; accord Lopez–Soto,* 205 F.3d at 1106 (concluding that the stop violated the Fourth Amendment because the officer held a mistaken view of Baja California law pertaining to vehicle registration stickers).

We considered a similar but slightly different issue in *Rojas–Millan,* where an officer made a traffic stop based on a Nevada statute that had not yet been interpreted by the courts with respect to whether it applied to non-residents such as the defendant in that case. *Rojas–Millan,* 234 F.3d at 469. Because the officer's understanding of the statute was consistent with our interpretation of the statute, we held that the stop was reasonable. *Id.*

■ In light of our precedent, the key issue here is whether, by driving with the parking placard hanging from the rearview mirror, King violated the traffic ordinance that occasioned the stop, Anchorage Municipal Code ("AMC") § 9.36.040(D). That section provides:

No person may drive any motor vehicle with any sign, poster, nontransparent material or an accumulation of snow, ice or frost *upon* the front windshield, side wings, or side or rear windows of such vehicle which *materially obstructs,* obscures or impairs the driver's clear view of the street or any intersecting street.

AMC § 9.36.040(D) (emphasis added).[2] Although Allen and the district court reasoned that indirect contact with the windshield via the rearview mirror fits within the statute, we conclude that the ordinance's use of "upon" the front windshield requires placement on or in direct contact with the windshield. An object hanging elsewhere, even if in close proximity, does not trigger a violation of the ordinance.

■■■ We interpret "upon" to require direct contact for two reasons: (1) the ordinary meaning of the word controls; and (2) the context of the word in the statute is instructive. We begin with the plain, ordinary meaning of the word. *See United States v. Mohrbacher,* 182 F.3d 1041, 1048 (9th Cir.1999) ("Where a statutory term is not defined in the statute, it is appropriate to accord the term its ordinary meaning.") (internal quotation marks and citation omitted). Unless the plain meaning leads to an absurd or unreasonable result, which it does not here, our "judicial inquiry is at an end." *Botosan v. Paul McNally Realty,* 216 F.3d 827, 831 (9th Cir.2000). Absent an indication from the legislative body that a specific legal meaning is intended, "the court may look to sources such as dictionaries for a definition." *Mohrbacher,* 182 F.3d at 1048 (citing *Muscarello v. United States,* 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998)).

First, the most common definition of "upon" requires direct contact. "Upon" is derived from two common words: "up" and "on." The word "upon" is "in any of various senses, used as an equivalent of on with no added idea of ascent or elevation, and preferred in certain cases only for euphoric or metrical reasons." *Random House College Dictionary* 1444 (rev. ed.1975). "Upon" may also be considered a more formal alternative to "on." *The New Shorter Oxford English Dictionary* 3523 (Thumb Index ed.1993). A review of various dictionaries reveals uncommon consistency: "upon" is most frequently defined as "on," which in turn is defined as "above and in contact with." *See, e.g., 2 The New Shorter Oxford English Dictionary* 1995, 3523 (defining "upon" as "[o]f position: = ON" and "on" as "[a]bove and in contact with"); *American Heritage Dictionary* 497, 759 (1973) (defining "upon" as "[o]n" and "on" as "[p]osition upon" and "[c]ontact with"); *Webster's Third New International Dictionary* 1574, 2517 (1963) (defining "upon" as "ON," which is defined as "a function word to indicate position over and in contact with that which supports from beneath"). The plain meaning of the statute requires that the object be on or in direct contact with the windshield—it does not prohibit items hanging from rearview mirrors.

Second, the placement and context of the word "upon" within the statute indicate that the statute does not prohibit placement of an item on the rearview mirror. As the Supreme Court has noted, "[t]he constructional problem is resolved by the ... principle ... that a word is known by the company it keeps (the doctrine of *noscitur a sociis* )." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). We have similarly recognized "that words are to be judged by their context and that words in a series are

2. The United States suggested for the first time at oral argument that King may have violated AMC § 9.36.040(C), which prohibits allowing a vehicle to be "loaded in such a manner as to interfere with the driver's view." We decline to consider this argument because it was not raised before the district court or briefed. *See Brooks v. City of San Mateo,* 229 F.3d 917, 922 n. 1 (9th Cir.2000) ("On appeal, arguments not raised by a party in its opening brief are deemed waived.") (quoting *Smith v. Marsh,* 194 F.3d 1045, 1052 (9th Cir.1999)).

to be understood by neighboring words in the series." *United States v. Carpenter,* 933 F.2d 748, 750–51 (9th Cir.1991). In the Anchorage code, the word "upon" immediately follows "sign, poster, nontransparent material or an accumulation of snow, ice or frost." *See* AMC § 9.36.040(D). All of these items are normally characterized as actually touching or affixed to a windshield or window, rather than just near. Thus, for example, the ordinance prohibits snow on the windshield but does not prohibit snow on the hood of the car, even though it might obstruct the driver's view and may well be in close proximity to the windshield. In the same vein, the ordinance does not prohibit placement of an item on the rearview mirror, even though the item might obstruct the driver's view and may well be in close proximity to the windshield.

In contrast to the Anchorage code, statutes from other jurisdictions explicitly prohibit obstructing items that hang from rearview mirrors. The proliferation of hanging dice, air fresheners, and a panoply of other personalized gadgets may well be the impetus for these laws. For example, Pennsylvania law provides:

> No person shall drive any motor vehicle with any object or material hung from the inside rearview mirror ... in such a position as to materially obstruct, obscure or impair the driver's vision through the front windshield....

75 Pa. Cons.Stat. § 4524(c) (1996); *see also* Minn.Stat. Ann. § 169.71(1) (West Supp.2001) ("No person shall drive ... any motor vehicle ... with any objects suspended between the driver and the windshield...."); N.Y. Veh. & Traf. Law § 375(30) (McKinney 1996) ("It shall be unlawful for any person to operate a motor vehicle with any object placed or hung in or upon the vehicle ... in such a manner as to obstruct or interfere with the view of the operator through the windshield...."); Va.Code Ann. § 46.2–1054 (Michie 1998) ("It shall be unlawful ... to drive a motor vehicle ... with any object ... other than a rear view mirror ... or other [approved] equipment ... suspended from any part of the motor vehicle in such a manner as to obstruct the driver's clear view ... through the windshield...."). These statutes illustrate that if Anchorage intended to prohibit items hanging from a rearview mirror but not touching the windshield, the local legislative body could have expressed its intent through explicit language.

Because the language of the statute does not demonstrate a clear intent to include items hanging from rearview mirrors, we interpret "upon" to require direct contact.[3] The government's argument that indirect contact via the rearview mirror is sufficient stretches the language of a simple statute without explicit approval from the legislative body. We have not hesitated to require strict adherence to the language of a traffic regulation where the regulation leads to an investigatory stop that results in a Fourth Amendment seizure. *See, e.g., Lopez–Soto,* 205 F.3d at 1106 (concluding that the stop was unconstitutional because the officer was mistaken about whether a registration sticker was required on the rear window of the vehicle). Any implication that a technical reading of the statute is somehow unfair is misplaced-we are simply interpreting an unambiguous term.

■ Although Allen acted reasonably[4] and his interpretation of the traffic law was reasonable, he was nonetheless mistaken in his belief that King's conduct violated the law. Because an officer's mistake of law cannot form the basis for reasonable suspicion to initiate a traffic stop,

---

3. Because a placard hanging from a rearview mirror is not "upon" the windshield within the meaning of the statute, it is unnecessary for us to consider the second prong of the ordinance, that is whether the placard materially obstructed King's view.

4. In fact, the court record includes a videotape of the traffic stop that reveals Allen acted with the utmost courtesy and civility toward King throughout the stop and arrest.

we reverse the district court's denial of King's motion to suppress.

REVERSED.