UNITED STATES of America,
Plaintiff–Appellee,

v.

Leigh Christina MIGUEL,
Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

Norman Jeremiah Johnson,
Defendant–Appellant.

Nos. 03–10217, 03–10218.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 1, 2003.

Filed May 27, 2004.

Rubin Slater, Jr., Tucson, AZ, for defendant-appellant Leigh Christina Miguel.

Harriette P. Levitt, Tucson, AZ, for defendant-appellant Norman Jeremiah Johnson.

Serra M. Tsethlikai, Assistant United States Attorney, Tucson, AZ, for plaintiff-appellee United States of America.

Before: O'SCANNLAIN, HAWKINS and FISHER, Circuit Judges.

FISHER, Circuit Judge:

On a hot summer day in July 2002, with temperatures over 100 degrees, Leigh Miguel and her uncle, Norman Johnson, were caught smuggling a group of five Mexican children and young adults in a four-door Dodge Stratus near Tucson, Arizona. Miguel had been pulled over by two sheriff's deputies who may have mistakenly believed the car's registration had expired. The five illegal immigrants, all from the same family and whose ages ranged from 4

to 19 years old, were lying unrestrained on the folded-down back seat and in the connecting trunk. One of the children, a five-year-old boy, was unconscious and unresponsive when first discovered. The defendants pled guilty to conspiring to transport illegal aliens, transporting illegal aliens for financial gain and placing in jeopardy the lives of illegal aliens. At sentencing, the district court enhanced Miguel's and Johnson's sentences based on three criteria: (1) intentionally or recklessly creating a substantial risk of death or serious bodily harm under U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2L1.1(b)(5) (2002); (2) actual bodily injury to the five-year-old boy under U.S.S.G. § 2L1.1(b)(6) (2002); and (3) vulnerability of the victims under U.S.S.G. § 3A1.1(b)(1) (2002).

On appeal, Miguel and Johnson challenge the legality of the stop as well as their sentence enhancements. We affirm the judgments and the sentences. We hold that if the deputies were mistaken in believing that the vehicle registration had expired, their mistake was one of fact due to their reasonable reliance on the expiration date in a computer database. We also hold that the district court did not abuse its discretion in enhancing the defendants' sentences for recklessly creating a substantial risk of death or serious bodily harm, because their vehicle was carrying more passengers than its rated capacity, the passengers were lying down without any restraints and the three youngest were crammed together in the trunk on a very hot day. Furthermore, even if the five-year-old's condition was caused in part from having trekked through the desert before Johnson and Miguel put him in the car, they were accountable because the harm came from reasonably foreseeable actions taken to further the jointly undertaken illegal smuggling operation. Finally, we hold that at least the young children were vulnerable victims because they did not fully appreciate the dangers involved in illegal immigrant smuggling.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Miguel and Johnson had arranged to pick up a group of illegal immigrants near Fresnal Village on the Tohono O'odham Indian Nation and take them to Eloy, Arizona for money. A smuggler known as "El Chano" had agreed to pick up the illegal immigrants in Mexico and guide them across the border. The group of illegal immigrants, all from the same family, consisted of two young adults, ages 17 and 19, and three young children, ages 4, 5 and 7. The group walked with the guide across the desert for approximately two days and had run out of water. Once they arrived at the predesignated pick up location, they waited for about three hours until Miguel and Johnson arrived in Miguel's Dodge Stratus. The 17–year–old and 19–year–old piled on top of the back seat, which Johnson had pushed down. The three youngsters squeezed into the trunk space of the car with their heads towards the car's interior. The temperature outside was over 100 degrees Fahrenheit. Although the air conditioning cooled the front of the car, the trunk area remained hot. Miguel had a water bottle in the front seat but did not give the children any water.

After Miguel had been driving for about 45 minutes, Deputies Schilb and Renteria of the Pima County Sheriff's Department spotted Miguel's vehicle. As part of a routine check, Schilb ran the car's license plate number through a computer connected to the Arizona Motor Vehicle Department's database. The computer showed the license registration as having expired on July 15, 2002, so the deputies stopped the vehicle for what they believed was an expired registration. Subsequently, it was established at the suppression hearing that

Miguel had purchased registration for the vehicle only a week before the stop, and her registration tags did not expire until September 2003.

Border Patrol agents arrived shortly after the stop. They removed the children from the vehicle but were unable to wake the five-year-old boy. His eyes were open but rolled back in his head. The agents called the paramedics, who gave him oxygen and hydrated him until he was taken by an ambulance to the hospital. The other two young children were also taken to the hospital for evaluation. All three were released on the same day to Child Protective Services.

Miguel and Johnson were arrested and charged with one count of conspiracy to transport illegal aliens for financial gain in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), (a)(1)(A)(ii), (a)(1)(B)(i); three counts of transportation of an illegal alien for financial gain and placing in jeopardy the life of an alien in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(B)(i), (a)(1)(B)(iii); and two counts of transportation of an illegal alien for financial gain in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(B)(i). After the defendants moved unsuccessfully to suppress the evidence obtained from the allegedly illegal stop, they pled guilty through written plea agreements.

At sentencing, the district court imposed a 6–level enhancement for both Miguel and Johnson under U.S.S.G. § 2L1.1(b)(5), finding that the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury. The court also levied a 2–level enhancement under U.S.S.G. § 2L1.1(b)(6) for bodily injury to the five-year-old boy. Lastly, the court made a 2–level upward adjustment because it found that the children, especially the five-year-old boy, were vulnerable victims under U.S.S.G. § 3A1.1(b)(1). Miguel and Johnson filed timely appeals.

We consolidated their appeals and now affirm.

## II. LEGALITY OF THE TRAFFIC STOP

■ A police officer needs "only reasonable suspicion in the context of investigative traffic stops." *United States v. Lopez–Soto,* 205 F.3d 1101, 1105 (9th Cir. 2000). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Id.* (internal quotation marks omitted). We review de novo the district court's determination of whether there was reasonable suspicion. *United States v. Arvizu,* 534 U.S. 266, 275, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

■ We have distinguished between mistakes of fact and mistakes of law when an officer has initiated a traffic stop based on a mistaken belief. "[I]f an officer makes a traffic stop based on a mistake of law, the stop violates the Fourth Amendment." *United States v. Twilley,* 222 F.3d 1092, 1096 (9th Cir.2000). For example, in *United States v. King,* 244 F.3d 736 (9th Cir.2001), the officer stopped a car with a placard hanging from the rearview mirror, which he believed was unlawful. *Id.* at 737–38. Construing the traffic ordinance, we concluded that placing an object in close proximity but not directly on the windshield did not violate the traffic ordinance. *Id.* at 740. Thus, we held that the officer made a mistake of law and did not have reasonable suspicion to stop the vehicle. *Id.* at 741–42.

■ In contrast, "[a] mere mistake of fact will not render a stop illegal, if the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot." *United States v. Mariscal,* 285 F.3d 1127, 1131 (9th Cir.2002). "[A]n officer's correct understanding of

the law, together with a good-faith error regarding the facts, can establish reasonable suspicion." *King,* 244 F.3d at 739. For instance, in *United States v. Dorais,* 241 F.3d 1124 (9th Cir.2001), we held that an officer's mistaken belief that a rental car was "overdue" was a mistake of fact. *Id.* at 1131. The defendant had rented a car in Hawaii from Dollar Rent–a–Car at 8:23 p.m. on July 4, 1998 and was supposed to return the car at the same time two days later. *Id.* at 1127. Hawaii law provides that a person who fails to return a rental car within 48 hours after the time stated in the rental agreement commits a misdemeanor. *Id.* at 1131; *see also* Haw. Rev.Stat. § 708–837 (2004). By July 8, the defendant had not returned the car, and Dollar notified the police at 10 a.m. that the car was "overdue." *Id.* at 1127. Thereafter, the officers stopped the rental car between 10:30 a.m. and 12 p.m. later that day. *Id.* Legally, though, the car was not overdue because the full 48–hour grace period had not elapsed. The court stated,"[T]he officers here stopped [the defendant] not because of a mistaken understanding of the law, but because of a mistake of fact. The officers correctly understood that Hawaii law criminalizes the possession of a rental car more than 48 hours beyond its return time; the officers simply made a mistake of fact as to how long overdue the car was." *Id.* at 1131.

■ The defendants contend that the deputies committed a mistake of law, not one of fact. As in *Dorais,* however, the deputies in this case did not misapprehend the law. They correctly understood that driving an unregistered vehicle is a violation of Arizona law. *See* Ariz.Rev.Stat. § 28–2153 (2003). They were also correct in believing that vehicle registrations could expire mid-month. *See, e.g., id.* § 28–2159; Ariz. Admin. Code § R17–4–304(D)(1) (2003) (stating that if the date of registration is "from the 1st day through the 15th day of the month ... [a]nnual

registration expires on the 15th day of the month" for vehicles initially registered after December 31, 1998). Even though the registration for Miguel's vehicle had not yet expired, the deputies did not draw this erroneous conclusion based on any misunderstanding that they had of the law. Rather, they relied on inaccurate information in a computer database. Thus, their mistake was one of fact. *See Dorais,* 241 F.3d at 1127, 1131; *see also United States v. Garcia–Acuna,* 175 F.3d 1143, 1146–47 (9th Cir.1999) (concluding that an agent made a mistake of fact when a dispatcher had told the agent that a license plate belonged to a different vehicle).

■ Nevertheless, an officer's belief in a mistaken fact must be "held reasonably and in good faith." *Twilley,* 222 F.3d at 1096 n. 1. The deputies' mistaken belief that Miguel's vehicle registration had expired was reasonable because it was possible for registrations to expire on the 15th. *See, e.g.,* Ariz.Rev.Stat. § 28–2159; Ariz. Admin. Code § R17–4–304(D)(1). Furthermore, the deputies did not have any reason to question the integrity of the information provided by the Arizona Motor Vehicle Department. *See Dorais,* 241 F.3d at 1131 ("Because the officers were acting on a police report from Dollar, whose honesty has not been questioned, they had reasonable suspicion to stop the car even if the report turned out to be mistaken due to its timing."). Moreover, the defendants have not suggested that the deputies held their mistaken belief in bad faith. Therefore, the deputies had reasonable suspicion to stop the vehicle based on their factually erroneous but reasonable and good faith belief. *See King,* 244 F.3d at 739.

### III. SENTENCING

■ A district court's interpretation of the Sentencing Guidelines is reviewed de novo. *United States v. Dixon,* 201 F.3d

1223, 1233 (9th Cir.2000). We review the district court's application of the Guidelines to the facts of a case for an abuse of discretion, *United States v. Angwin*, 271 F.3d 786, 808 (9th Cir.2001), and factual findings during sentencing for clear error. *Id.*

## A. Substantial risk of death or bodily injury[1]

■■■ The Sentencing Guidelines require an increase in the defendant's offense level "[i]f the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." U.S.S.G. § 2L1.1(b)(5). Furthermore, the commentary to U.S.S.G. § 2L1.1(b)(5) explains, "Reckless conduct to which the adjustment from subsection (b)(5) applies includes ... transporting persons in the trunk ... of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle or vessel, or harboring persons in a crowded, dangerous, or inhumane condition." U.S.S.G. § 2L1.1(b)(5), cmt. n. 6 (2002).

Miguel contends that there was no substantial risk of death or serious bodily injury to the children because they were placed in the hatchback area of the car. For authority, she relies on *United States v. Dixon*, 201 F.3d 1223 (9th Cir.2000). In *Dixon*, two immigrants were found in the hatchback of a Ford Escort. *Id.* at 1226. The district court increased the defendant's offense level under U.S.S.G. § 2L1.1(b)(5), finding that the immigrants were "without adequate oxygen" and "were unable to extricate themselves" because they were in the "trunk." *Id.* at 1233. On appeal, we noted, "[A] hatchback area and a trunk are, in fact, very different. Unlike a trunk, except for the

lack of seat belts, the dangers of riding in the hatchback area of a car are not obvious. For example, a person hiding in a locked trunk could not extricate himself, while a person hiding in a hatchback area easily could extricate himself by pushing up the lightweight, flimsy hatchback cover." *Id.* Consequently, we held that the district court's findings of fact were clearly erroneous because there was no evidence that "the hatchback area was airtight" or that "the aliens were unable to extricate themselves." *Id.*

The government responds that *Dixon* is inapplicable here because the children were not placed in a hatchback but rather a trunk. The government is technically correct. The exhibits show that the Dodge Stratus was a 4–door sedan with a trunk, not a hatchback with a flimsy cover over the back area. But the reasoning of *Dixon* still applies here. The conditions of a trunk with the back seat pushed down are more similar to the conditions of a hatchback than a closed trunk. The children were not enclosed in an airtight area, and they probably could have extricated themselves if necessary.

If these were the only facts, we might conclude that the district court abused its discretion by applying the § 2L1.1(b)(5) enhancement. However, the district court in reaching its decision noted three important additional facts. First, the vehicle was carrying more passengers than its rated capacity. Second, the children were lying down without restraints of any kind. Third, it was a very hot day, and riding in the trunk on such a hot day created a risk of injury. These factual findings were not in clear error.

On facts similar to these, we concluded in *United States v. Hernandez–Guardado*, 228 F.3d 1017, 1027–28 (9th Cir.2000), that

**1.** Pursuant to his plea agreement, Johnson does not appeal the enhancement of his sentence under U.S.S.G. § 2L1.1(b)(5). Thus, this issue is relevant only to Miguel's sentence.

the district court did not abuse its discretion in applying the § 2L1.1(b)(5) enhancement. There, the defendants had overloaded each vehicle with two or three extra passengers in excess of the vehicle's capacity, and the passengers "were not strapped into seats with seatbelts but were instead lying unrestrained on floorboards and across the seats." *Id.* The evidence here goes beyond *Hernandez–Guardado* given the extreme heat. In light of the totality of the circumstances, we hold that "although 'reasonable minds could differ as to ... the resulting degree of risk,' the district court did not abuse its discretion by imposing the sentencing enhancement in this case." *United States v. Carreno,* 363 F.3d 883, 891 (9th Cir.2004) (quoting *Hernandez–Guardado,* 228 F.3d at 1028).

**B. Actual bodily injury**

 Section 2L1.1(b)(6) provides, "If any person ... sustained bodily injury, increase the offense level according to the seriousness of the injury...." It then prescribes a 2–level increase for "bodily injury" and a 4–level increase for "serious bodily injury." U.S.S.G. § 2L1.1(b)(6). "Bodily injury" means "any significant injury," including "an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, cmt. n. 1(b) (2002). "Serious bodily injury" encompasses injury "requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." *Id.* § 1B1.1, cmt. n. 1(i).

The district court found "bodily injury" to the five-year-old boy but no "serious bodily injury." The defendants claim that there was no evidence that anyone sustained bodily injury. The district court's finding, however, was not clearly erroneous. The border patrol agents could not wake the five-year-old even though they tried several times. His eyes were open but rolled back, revealing only the white of

his eyes. He drifted in and out of consciousness in the 20 to 25 minutes it took the paramedics to arrive. The paramedics were also unable to wake him. Consequently, they gave him oxygen, put him in the ambulance and transported him to the hospital. The boy's unconscious condition was the "type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, cmt. n. 1(b). On this record, the district court's finding was not clearly erroneous.

The defendants claim that the boy's condition could have been caused by his trek through the desert before he got into the car. The Sentencing Guidelines specify that specific offense characteristics shall be based on "all harm that resulted" from "all reasonably foreseeable acts and omissions of others in furtherance of [a] jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B), (a)(3) (2002). A "jointly undertaken criminal activity" is "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." *Id.* § 1B1.3(a)(1)(B), cmt. n. 2. Here, the jointly undertaken criminal activity was the illegal transportation of the family group from Mexico to Eloy, Arizona. El Chano took the family group through the desert in furtherance of that jointly undertaken criminal activity, and it was reasonably foreseeable that some of the children at least might succumb to heat exhaustion or fatigue given the hot, barren area through which they had to travel. Thus, even if the boy's condition was caused in part by the trek through the desert before Johnson and Miguel put him in their car, they are accountable for the boy's condition resulting from such reasonably foreseeable acts taken to further the jointly undertaken smuggling operation.

**C. Vulnerable victim**

Section 3A1.1(b)(1) states, "If the defendant knew or should have known that a

victim of the offense was a vulnerable victim, increase by 2 levels." U.S.S.G. § 3A1.1(b)(1). The Application Notes explain that a vulnerable victim is one who is "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b)(1), cmt. n. 2 (2002). The district court adjusted the offense upwards because it found that the young children, especially the five-year-old, were unusually vulnerable due to their young age and physical condition after a two-day walk in the desert.

▇ The defendants argue that the victim must be particularly vulnerable to the offense at issue and that the young children in the trunk were not more vulnerable to the crime of smuggling than anyone else. On the contrary, these young children were more susceptible to the criminal conduct because they did not fully appreciate the danger involved in illegal smuggling.[2] For instance, they obediently climbed into the trunk area when Johnson put the back seat down, and despite the temperature in the trunk, they did not ask for any water even though Miguel had a bottle of water in the front of the car. Consequently, the district court did not err in finding that the young children were vulnerable victims.

The defendants also contend that the adjustment is inappropriate because they were not "preying on children." However, we have said, "The requirement that the defendant must target the vulnerable victim is inconsistent with the plain language of § 3A1.1, which only requires that the defendant 'should have known' that the victim was vulnerable." *United States v. O'Brien,* 50 F.3d 751, 755 (9th Cir.1995). Here, Miguel and Johnson should have known that the young children were more susceptible to the criminal conduct after observing the children's ages, physical conditions and demeanor. The district court did not abuse its discretion in applying the vulnerable victim adjustment.

**AFFIRMED.**

---

**2.** Because these children were in fact more susceptible to the offense at issue, we do not decide whether a victim's age can render him or her a vulnerable victim independent of any susceptibility to the particular criminal conduct. *Compare United States v. Castellanos,* 81 F.3d 108, 110 (9th Cir.1996) (noting in dictum that "the separate concepts of 'unusually vulnerable' and 'particularly susceptible' . . . suggest that characteristics of age, physical condition or mental condition may *per se* render a victim worthy of the special protection of [U.S.S.G. § 3A1.1], whereas other circumstances might make the victim subject to such protection depending upon the nature of the particular criminal conduct"), *with United States v. Luca,* 183 F.3d 1018, 1025 n. 5 (9th Cir.1999) (suggesting that an old man would not be vulnerable to assault if he were "a commando in his youth, skilled in all forms of martial arts").