[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 4, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-15597
Non-Argument Calendar

_____

D. C. Docket No. 06-00454-CV-3-RV-MD

ALPHONSO A. PERRY,

Plaintiff-Appellant,

versus

MICHAEL J. ASTRUE,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(June 4, 2008)**

Before ANDERSON, BIRCH and HULL, Circuit Judges.

PER CURIAM:

Alphonso Perry appeals the district court's order affirming the

administrative law judge's ("ALJ") denial of his application for disability

insurance benefits under 42 U.S.C. § 405(g) and supplemental security income under 42 U.S.C. § 1383(c)(3). First, Perry argues that the district court's order should be reversed because the ALJ erred in failing to identify which of his impairments were severe at the second step of the sequential evaluation process, resulting in a deficient record that does not allow us to determine whether the ALJ used the correct legal standard and whether the ALJ's decision was based on substantial evidence. Perry also argues that the ALJ erred in relying on the Medical Vocational Guidelines (the "grids") to determine whether he was disabled because the presence of non-exertional impairments renders the grids inapplicable.

Upon review of the record and consideration of the briefs, we discern no reversible error, and we AFFIRM.

## I. BACKGROUND

Perry applied for a period of disability, disability insurance benefits, and supplemental security income alleging a disability onset date of 25 June 2003. He identified an enlarged heart, high blood pressure, and pain in his chest, left arm, left leg, and back. The Commissioner denied his application. Perry requested and was granted a hearing before an ALJ. At the hearing, Perry testified that he was 40 years old and had a tenth-grade education, and he lived with his wife and 16 year-old son. Perry's daily routine consisted of sitting down and watching television or

lying down, because it sometimes helped with his pain and blood pressure, and because there was not anything else for him to do. He testified that he tried to walk around the block a few times a week to avoid getting stiff. Perry stated that he was able to bathe, groom, and dress himself. He did not regularly use a car. Perry testified that he could read and write, but not well. He stated that he needed to take the written driving test three times before he was able to pass and that his wife always read his correspondence to him. Perry testified that, prior to his medical problems, he worked as a stocker, custodian, general laborer, did landscaping work, and layed floors. He claimed that a degenerative spinal problem caused him to suffer from pains in his entire left side, and that his pain medication was effective but he still had problems with his blood pressure despite medication. Before he underwent a spinal operation, he was unable to help his wife around the house.

According to the record, on 4 June 2003, Perry presented to the Baptist Hospital emergency room with complaints of acute chest pain. R.Exh. at 145. On examination, his heart rate and rhythm were regular, he had no respiratory distress, and a chest x-ray revealed no significant abnormalities. He received a Toradol injection (for the pain) and was discharged with a prescription for Darvocet (a pain reliever). Id. at 146, 157. On 20 June 2003, Perry saw Karen G. Snow, M.D. ("Dr.

3

Snow"), his treating physician, complaining of pains in his left chest, arm, and back. Dr. Snow noted that he received an electrocardiogram at the emergency room earlier that month, which revealed enlargement of the left ventrical of his heart, though the left ventricle was functioning normally. Id. at 170. Dr. Snow found that Perry had a regular heart rate and rhythm. His blood pressure was 130/80. Dr. Snow found that Perry had full range of movement in his extremities and that he did not have any edema. Id. Dr. Snow recommended a stress test, prescribed Lisinopril for his high blood pressure, and referred Perry to pain management. The stress test results were normal.

Perry returned to Dr. Snow for a follow-up visit several days later. Dr. Snow noted that Perry's blood pressure was coming down, and he was having no side effects from his medications. He complained of pain in his left upper back and neck which radiated into his left arm, but Dr. Snow found no tingling or weakness in Perry's arm and he had full range of motion in his neck and extremities. Id. at 168. Perry had tenderness in his neck and shoulder muscles and in the muscles along his upper back, but he did not have any spasms. Id. Dr. Snow assessed a strain in Perry's left back and referred him to physical therapy.

In Perry's next follow-up visit with Dr. Snow, in August 2003, he said that he was contemplating filing for disability. At the time, his blood pressure was

130/84. Dr. Snow stated that she thought he would be a good candidate for vocational rehabilitation and should consider a career change because he has degenerative disc disease, which "is likely to progress and he will find it more and more difficult to do his job duties." Id. at 167. Perry completed a disability worksheet on 24 September 2003. He reported that he suffered sharp pains in his chest, back, shoulder, legs, and arm, aching pains in his back, leg and arm, and fluttering in his heart. He stated that his pain and stiffness limited his ability to perform housecleaning, yard work, and driving, but that his medication gave him relief. Perry returned to Dr. Snow in November 2003 complaining of uncontrolled hypertension and chest pain. His blood pressure at the visit was 122/72. Dr. Snow noted that Perry was applying for disability and was concerned about Perry being exposed to extreme temperatures or chemicals on the job. Id. at 201. Dr. Snow also noted that he was unable to afford his medications.

On 12 January 2004, Perry presented to Richard W. Lucey, M.D. for a consultative disability examination. Id. at 171-75. His blood pressure was 160/90, he had a regular heart rate and rhythm, and his lungs were clear. Id. at 172. Perry had full range of motion in his neck, a mild decrease in range of movement in his left shoulder with some crepitus at the shoulder joint and in the right knee, normal grip strength and normal fine manipulative movements, and no weakness, atrophy,

5

or sensory deficits in his upper extremities.  Id.  Perry also had full range of motion in his lower extremities and major joints, he had a normal gait, he was able to walk without signs of weakness or uncoordinated muscle movements, and he was able to move from a supine to a sitting position without pain.  Id.  Perry had somewhat diminished range of motion in his lower back.  Id.  Dr. Lucey appraised high blood pressure, cardiomegaly (enlarged heart), heartburn, probable degenerative arthritis in the left shoulder and right knee, and non-cardiac chest pain which was "possibly related to acid reflux."  Id. at 172-73.

Perry returned to Dr. Snow in late March 2004 for a check of his blood pressure and to give her his disability forms to fill out.  He complained of pains in his neck and upper back and swelling in his right knee.  His blood pressure was 132/82, he had full range of motion in his extremities, and no extremity or joint edema.  Dr. Snow noted that his x-rays did not seem to show any sign of degenerative arthritis.  Id. at 198.  Based on a diagnosis of degenerative arthritis and intervertebral disc disorder with myelopathy, Dr. Snow stated that Perry could sit only seven hours and stand or walk only one hour in an eight-hour day and that Perry could only sit or stand, less than one hour at a time.  Id. at 205.  Dr. Snow stated that Perry could lift or carry 50 pounds occasionally, 10 pounds frequently, and 5 pounds all of the time.  Id.  Dr. Snow stated that Perry had normal gripping

6

ability, but he was unable to perform pushing, pulling, and fine manipulation. Perry could bend, squat, crawl, and reach occasionally, but he could never climb. Id. Dr. Snow stated that Perry must completely avoid unprotected heights and moving machinery, could not operate a car, and must avoid mild exposure to changes in temperature and humidity, as well as exposure to dust, fumes, and gases. Id. Dr. Snow stated that Perry's pain was intractable and virtually incapacitating and that his medications did not effect his ability to work. Id. at 206.

A 19 April 2004 MRI of Perry's middle back revealed minor spondylosis (deformation or degeneration of the joints in the spine), no herniated discs, and no significant narrowing of the spinal canal. Id. at 208. An MRI of his neck, conducted on the same day, revealed degenerative disc desiccation and spondylosis, mild disc bulging at C5-6 and C6-7, no herniated discs, and no significant central canal narrowing. Id. at 209. An x-ray of Perry's right knee found no abnormalities.

In a June 2004 appointment with Dr. Snow, Perry complained of continuing neck pain related to his arthritis, and he stated that his blood pressure medication seemed to be helping him with his hypertension. Dr. Snow gave him additional prescriptions for his blood pressure. One week later, Perry presented to Dr. Snow

at the emergency room complaining of severe left-side chest pain which radiated down his left shoulder into his left arm. He also complained of shortness of breath, nausea, and chills. His oxygen saturation was 98% or greater, his heart rate was 62, and his blood pressure was 117/60. His chest was clear and he had no chest wall tenderness. A chest x-ray was normal and an electrocardiogram showed normal sinus rhythm. Perry moved his extremities well and was without edema.

Perry returned almost a year later to Dr. Snow, on 2 May 2005, complaining of tingling in his left arm, chronic upper neck and thoracic back pain, headaches, insomnia, and problems concentrating because of his pain. Id. at 226. Dr. Snow noted that Perry was not taking any pain or blood pressure medication because he could not afford it. She also noted that he had done well without pain medication. Id. His blood pressure was 136/98 and he had full range of motion in his extremities. Dr. Snow ordered an MRI of Perry's neck and back, and prescribed medicine for Perry's hypertension. The MRI of Perry's neck revealed mild to moderate degenerative disc disease, no focal disc herniation (hernia involving less than 25% of the disc), and multilevel bilateral narrowing of spinal cord canal. Id. The MRI of the back showed minimal degenerative disc disease and a small central disc protrusion which touched the spinal cord, but no indication of significant canal narrowing. Id.

Following his MRIs, Perry visited Dr. Snow on 6 June 2005. She found that the MRIs showed degenerative disc disease and referred him to a neurosurgeon. Id. at 224. She continued his blood pressure medication and included a prescription for pain medication. On 27 June 2004, Perry visited Dr. Charles E. Chapleau, a neurosurgeon, for an evaluation of his neck and spinal problems. On examination, Perry's blood pressure was 140/110, his heart rate and rhythm were regular, he had good range of motion in his shoulder and lower back, and his chest was clear. After reviewing the May 2005 MRI of the neck, Dr. Chapleau concluded that the cause of Perry's pain was spurring at the C5-6 vertebrae. Id. at 240. Dr. Chapleau recommended that Perry undergo an anterior cervical fusion (neck surgery to relieve pressure on the nerves or spinal cord), and he performed the procedure on 13 July 2005. Id. at 235, 240. Perry tolerated it well. Id. at 240.

Dr. Snow completed a second physical assessment of Perry on 20 July 2005. Id. at 231. She stated that Perry could sit and stand or walk less than one hour at a time per day, and that he could sit and stand or walk a combined total of two hours per day. Id. She stated that he could lift and carry 50 pounds occasionally, 20 pounds frequently, and 10 pounds continuously. Id. She stated that he could grasp with his hands repetitively and had normal fine manipulation abilities, but he could not push and pull with his arms. Id. She found that he could not use his feet for

repetitive movements.  Id.  She stated that he could bend or squat occasionally, reach frequently, but he could not crawl or climb.  Id.  Dr. Snow also stated that Perry needed to avoid mild exposure to temperature and humidity changes, dust, fumes, and gases; and that he could perform moderate amounts of car driving.  Id.  Dr. Snow stated that Perry's pain was intractable and virtually incapacitating and that his medication did not affect his ability to work.  Id. at 232.  On 21 July 2005, Perry returned to Dr. Chapleau for a follow-up and reported having had excellent relief of his left arm pain.  Id. at 234.

Following the 23 August 2005 hearing, after describing the five step evaluation required by 20 C.F.R. §§ 404.1520 and 416.920, the ALJ found that Perry had not engaged in substantial gainful activity.  The ALJ also found that Perry had "impairments that are severe within the meaning of the Regulations, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  Id. at 19.  The ALJ then determined whether Perry retained the residual functional capacity ("RFC") to perform his past relevant work or other work existing in the significant numbers in the national economy.  Id.  In making the decision the ALJ stated that he:

> must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [and] must also consider any medical opinions, which are statements from acceptable

medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations.

Id.

In determining Perry's RFC, the ALJ cited 20 C.F.R. §§ 404.1545 (stating that the RFC should be evaluated based on all of a claimant's impairments, whether severe or not, and all of the available evidence) and 416.945 (stating that the RFC should be determined using all available medical and other evidence and should include the consideration of all impairments) and Social Security Ruling 96-8p (stating that a claimant's impairments should be assessed singly and in combination when determining the RFC). Id. The ALJ concluded that Perry retained "the residual functional capacity to perform sedentary work." Id. The ALJ stated that there was a "vast disparity between [Perry's] subjective complaints and the medical evidence." Id. He stated that review of the most credible evidence did not "establish the existence of either single or combined medical conditions which could reasonably . . . compromise [Perry's] performance of all forms of gainful activity." Id. The ALJ noted that Perry alleged "an enlarged heart, high blood pressure, chest pain, and degenerative disc disease as a basis for disability," but concluded that, "while the record contains evidence of the existence of these impairments, the objectively demonstrable evidence of record fails to support that [Perry] is as impaired as he has alleged." Id. at 23.

11

The ALJ discounted the evidence of Dr. Snow's 20 July 2005 physical assessment pointing out that it disagreed with Dr. Snow's own medical records. Id. He noted that Dr. Snow had considered Perry as an excellent candidate for vocational rehabilitation. Id. The ALJ also noted that Dr. Snow's last treatment record, on 6 June 2005, set Perry's blood pressure at 130/88. The ALJ stressed that Perry's recent chest x-rays and electrocardiograms have been normal and that Dr. Snow stated that Perry had done well without medication for chronic pain. Id.

The ALJ supported his findings with Dr. Lucey's evaluation on 12 January 2004. Id. at 24. The ALJ noted that Dr. Lucey's examination revealed that Perry had full range of motion in his neck, that his lungs were clear and that his heart rate was regular. Id. He also pointed out that Dr. Lucey found that Perry had normal grip strength and normal fine manipulatory skills, that Perry was able to heel, toe, and tandem walk normally, had a normal gait, and exhibited no sign of weakness or ataxia. Id. The ALJ particularly stressed that the only recommendation Dr. Lucey made was that Perry needed further treatment of his high blood pressure. Id. The ALJ also relied upon Dr. Chapeau's medical records. Id. He stressed that Dr. Chapeau reported that Perry had excellent relief from his left-arm pain following his surgery. Id. He also stated that, although Perry was supposed to return for a follow-up appointment with Dr. Chapeau, there is no evidence that he did so. Id.

Considering Perry's testimony, the ALJ noted that Perry testified that he was able to care for his personal needs, drive a car, watch television, and walk around the block. Id. He also noted that the clinical findings in the form of electrocardiograms and physical examinations have all been within normal limits. Id. He stressed that Perry's physical impairments have all been alleviated with prescription medication. Id. at 25. He stated that the lack of medical documentation lead him to conclude that Perry was not visiting his physicians for treatment regularly, which indicated that Perry had not required treatment recently. Id. The ALJ then concluded that Perry could regularly perform "the full range of sedentary work." Id. at 27. Because he found that Perry was able to perform sedentary work, the ALJ determined that he was no longer able to perform his past relevant work as a laborer or stocker. Id. at 26.

The ALJ also determined, based on the grids, that Perry could perform work which existed in significant quantities in the national economy, able to perform the "full range of sedentary work" under 20 C.F.R. § 404.1567. Id. at 28. In choosing to use the grids, the ALJ acknowledged that he had to find that Perry was able to perform the strength demands required by the work at the given level of exertion and that "there are no nonexertional limitations." Id. at 26. The ALJ determined that Perry's age and educational limitations would not preclude him from

13

performing sedentary work.  Id. at  27. The ALJ stated that, "[b]ecause the evidence supports a finding that [Perry] can perform the demands of the full range of sedentary work, a finding of 'not disabled' is directed by [the grids]."  Id.

The ALJ denied Perry benefits.  Perry filed a request for review with the Appeals Council, which was denied.  Perry then filed his complaint in the district court.  A magistrate judge recommended that the district court affirm the decision of the Commissioner.  The district court concurred with the magistrate's report and recommendation and affirmed the Commissioner's decision.  This appeal followed.

## II.  DISCUSSION

"We review the Commissioner's decision to determine if it is supported by substantial evidence and based on proper legal standards."  Crawford v. Comm'r, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion . . . Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence."  Id. at 1158-59 (quotations and citations omitted).  We treat the ALJ's decision as the Commissioner's final decision when the ALJ denies benefits and, as here, the Appeals Council denies review.  Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).  In conducting this review, we may not reweigh

14

the evidence or substitute our judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "With respect to the [ALJ]'s legal conclusions, however, our review is de novo. Lewis v. Barnhart, 285 F.3d 1329, 1330 (11th Cir. 2002) (per curiam).

Perry argues that the ALJ erred in the second step of the evaluation process by failing to identify which of his impairments were severe. An ALJ must evaluate the following five criteria in deciding whether a claimant is entitled to social security disability: (1) "[i]s the individual performing gainful activity;" (2) "[d]oes [he] have a severe impairment;" (3) "[d]oes [he] have a severe impairment that meets or equals an impairment specifically listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;" (4) "[c]an [he] perform [his] past relevant work;" and (5) "[b]ased on [his] age, education, and work experience, can [he] perform work of the sort found in the national economy." Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). A "severe impairment" is one that "significantly limits [the] claimant's physical or mental ability to do basic work activities." Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997). We will disregard any errors or defects in the lower court that "do not affect any party's substantial rights." Fed. R. Civ. P. 61 (harmless error); Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error doctrine in the context of a social security case). However, we

15

will reverse if the ALJ fails to provide us with "sufficient basis for a determination that proper legal principles have been followed." Martin, 894 F.2d at 1529.

In this case, Perry argues that the ALJ did not adequately explain the legal basis for his determination of Perry's RFC for purposes of appellate review because the ALJ's opinion does not identify which impairments the ALJ found to be severe. However, the record does not support this argument. The ALJ explicitly stated that he was following the five-step sequential evaluation process required by 20 C.F.R. § 404.1520. See R.Exh. at 18. Although the ALJ did not identify which impairments he considered severe at step two, he explicitly stated, when determining Perry's RFC in step four, that he was considering "all symptoms, including pain" and that Perry alleged "an enlarged heart, high blood pressure, chest pain, and degenerative disc disease." Id. at 19, 23. The ALJ also stated that he considered these conditions singly and in combination. See id. at 19; see also Walker v. Bowen, 826 F.2d 996, 1001 (11th Cir. 1987) (per curiam). Contrary to Perry's assertion that the ALJ might not have considered the non-exertional aspects of his impairments, the ALJ specifically acknowledged that he had to consider whether Perry had non-exertional limitations when evaluating whether or not to use the grids. Id. at 26. Thus the record does not support Perry's arguments that the ALJ might not have considered those impairments which he

16

was not labeling severe when evaluating steps four and five. The ALJ also thoroughly explained his reasoning, citing to the medical records detailing Perry's medical history and symptoms and citing to the testimony from the hearing that described Perry's subjective feelings and daily activities. The ALJ included citations to the social security rulings and statutes he was relying on in making his determination

Because the ALJ found that Perry was not disabled after enumerating and evaluating all of the impairments and symptoms alleged and explaining his reasoning based on the record and the law, any error the ALJ may have made by not specifically identifying at step two which impairments he found to be severe did not deprive us of the ability to evaluate the ALJ's legal reasoning based upon the record.

Second, Perry argues that, because he had non-exertional impairments, the ALJ erred by using the grids to determine whether he was disabled. Once a claimant shows that his impairment prevents him from performing his past relevant work, the burden shifts to the Commissioner, "who must produce evidence to show that the claimant is able to perform alternative substantial gainful work that exists in the national economy." Cowart v. Schweicker, 662 F.2d 731, 736 (11th Cir. 1981). An ALJ may use the grids to aid in determining "whether [a] claimant has

17

the ability to adjust to other [jobs] in the national economy." Phillips, 357 F.3d at 1239-40. The grids are:

> a series of matrices which correlate a set of variables-the claimant's residual functional capacity (i.e., the ability, despite impairments, to do sedentary, light, etc. work), age, educational background, and previous work experience. Upon the entry of a set of these variables into the appropriate matrix a finding of disabled or not disabled is rendered.

Gibson v. Heckler, 762 F.2d 1516, 1520 (11th Cir. 1985) (per curiam). "In appropriate circumstances, the grids may be used" instead of the testimony of a Vocational Expert ("VE") to establish whether such work exists and, in turn, whether the claimant is "disabled." Allen v. Sullivan, 880 F.2d 1200, 1201-02 (11th Cir. 1989) (per curiam). However,

> [w]hen the claimant cannot perform a full range of work at a given level of exertion or the claimant has non-exertional impairments that significantly limit basic work skills, exclusive reliance on the grids is inappropriate. In such cases, the [ALJ]'s preferred method of demonstrating that the claimant can perform other jobs is through testimony of a VE.

Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999) (citations omitted). Reliance on the grids is proper where substantial evidence supports the ALJ's determination that the claimant's non-exertional impairments did not significantly limit his ability to perform specified types of work. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985) (per curiam). According to the Social Security regulations,

18

> [s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). As the Commissioner points out, to the extent that Perry argues that the existence of non-exertional limitations precludes the use of the grids, his argument is without merit. See Sryock, 764 F.2d at 836. Instead, the question we must answer is whether substantial evidence supports the ALJ's findings that Perry's non-exertional impairments do not limit his ability to perform sedentary work. See id.

In this case, we conclude that substantial evidence supports the ALJ's finding that Perry did not suffer from non-exertional limitations that significantly impaired his ability to perform sedentary work. Dr. Snow's 29 March 2004 physical assessment stated that Perry could continuously lift 5 lbs and frequently lift 10 pounds, could carry 5 pounds continuously and 10 pounds frequently, and could grasp his hands repetitively. R.Exh. at 205. Dr. Snow's physical assessment also stated that Perry could sit or stand less than one hour at time, could sit for a combined total of seven hours in a day, and could only stand or walk for a combined total of one hour in a day. Id. Dr. Snow considered Perry a "good

19

candidate for vocational rehabilitation." Id. at 167. Dr. Snow's records reflect that Perry's pain medication provides him with relief. Id. at 111, 115, 168, 230. Both of her physical assessments state that his medications do not interfere with his ability to work. Id. at 206, 232. Moreover Perry himself testified at his hearing that much of his day is spent sitting and watching television, with occasional hours spent lying down. Id. at 363-64.

As to Perry's arguments respecting his pre-surgery spinal pain, the record reflects that he regularly received pain medication which gave him relief, id. at 111, 115, and he was generally able to move and function, with the ability to walk in a normal posture and gait, and having full range of motion in all major joints. Id. at 172. Dr. Snow's most recent records from an appointment with Perry, written before his surgery, state that he had full range of motion in his extremities and had no tenderness in the muscles along his spine. Id. at 226. Although she noted that Perry was very upset about his pain in her meeting with him, she also noted that he had functioned well without chronic pain medication. Id. Dr. Chapleau's medical records following the surgery state that Perry's neck surgery provided relief for the pain in his arm and that he tolerated the procedure well. See id. at 234.

Although Perry continues to suffer from hypertension and high blood

pressure, the record reflects that he has been able consistently to control it using medication and his heart rate and rhythm have been regular.  Id. at 167-68,172, 200, 228-30.  Perry's stress test, chest x-rays, and electrocardiograms have all been normal and his heart rate and rhythm at his medical exams are consistently regular, even though the medical records reflect that he often complained of chest pain and has an enlarged left ventricle.  Id. at 24, 150, 168, 170, 172, 199, 200, 228, 229, 240, 257.  Finally, the record does not support Perry's argument that the ALJ did not consider Perry's pre-surgery pain.  The ALJ considered the medical records of Dr. Snow, who treated Perry before his surgery and documented his spinal problems and pain, and Dr. Chapeau , who was Perry's surgeon.  Id. at 23-24.  Moreover, in determining Perry's RFC, the ALJ specifically stated that he had to consider all symptoms, "including pain."  Id. at 19.

Because the clinical evidence in the record as well as the subjective statements of Perry's doctors provide substantial evidence that his non-exertional impairments would not significantly limit his ability to perform sedentary work, the ALJ correctly relied on the grids to determine that Perry was not disabled.  See Sryock, 764 F.2d at 836.

## III.  CONCLUSION

21

Perry appeals the district court's order affirming the ALJ's denial of his application for disability insurance benefits and supplemental security income. We conclude that the ALJ considered whether or not any of Perry's impairments were "severe" at step four in the five-part disability analysis, allowing us to determine that the ALJ applied the correct legal principles to evaluate whether or not Perry is disabled, and that substantial evidence supports the ALJ's decision to deny disability benefits to Perry. We also find that the ALJ properly relied upon on the Medical Vocational Guidelines to determine whether or not Perry was disabled because Perry's non-exertional impairments did not significantly limit his ability to perform sedentary work.

**AFFIRMED.**